LONG et al., Appellants,

v.

TOKAI BANK OF CALIFORNIA et al., Appellees.

[Cite as *Long v. Tokai Bank of California* (1996), 114 Ohio App.3d 116.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 15748.

Decided Sept. 20, 1996.

*James W. Kelleher* and *Michael W. Sandner,* for appellants.

*Christopher F. Johnson,* for appellee Tokai Bank of California.

*Mark E. Defossez,* for appellee Nissho–Iwai American Corporation.

BROGAN, Presiding Judge.

This matter is before the court on the appeal of plaintiffs/appellants from the summary judgment granted to Tokai Bank of California ("Tokai"). The undisputed facts pertinent to resolution of this case are as follows. Tokai is a banking corporation and is not in the business of commercial leasing. Tokai provides a number of banking services, including, on occasion, the purchase and lease of machinery and equipment. The purpose of the lease agreements is to provide a method of financing so that customers can facilitate their acquisition of equipment. Accordingly, on May 6, 1988, Tokai entered into a master lease agreement with Green Tokai, Ltd. ("Green"), so that Green could purchase a flocking machine from Nissho Iwai American Corporation ("Nissho").

The flocking machine had been selected by Green before the lease was signed, and Tokai did not participate in the selection or negotiation of terms between Green and Nissho. Tokai also never had possession, custody, or control over the machine, nor did Tokai ever participate in its possession, maintenance, or operation.

The original lease term was from May 17, 1988 through May 17, 1995, and during that time, Green was to pay rental fees for the flocking machine. Under Section 16 of the agreement, Green was allowed to purchase the flocking machine at the end of the original lease term or at the end of any renewal term, for the machine's fair market value. Moreover, Section 9 stated as follows:

"Lessee agrees that the equipment will be used solely in the conduct of the business of Lessee and will at all times be and remain in the possession and control of Lessee at the place of installation set forth in the relevant Lease Supplement. Lessee warrants that each item of equipment will at all times be used and operated under and in compliance with the laws of the jurisdiction in which such item may be operated, and in compliance with all lawful acts, rules, regulations, and orders of any commissions, boards or other legislative, executive or judicial bodies of officers having power to regulate or supervise the use of such property and, in any event, in compliance with the manufacturer's schedule of preventive maintenance."

Finally, in Section 17, Tokai also disclaimed any express and implied warranties and assigned right to the warranties to Green.

On September 23, 1991, during the original lease term, the flocking machine exploded and injured Ralph Long, who was an employee of Green. Long then filed the present action on September 22, 1993 against Tokai, Nissho (the seller), and Sankyo–Kasei (the manufacturer of the machine), based on negligence and products liability claims. Another entity, Tokai Bank, Ltd., was sued, but was voluntarily dismissed by appellants. On November 27, 1995, the trial court filed a decision granting summary judgment to Tokai on the negligence and products liability claims, based on three findings: (1) Tokai was not subject to products liability claims because it was neither a manufacturer nor a supplier as defined by R.C. 2307.71; (2) claims for breach of warranty were not appropriate, since Tokai disclaimed warranties in the lease; and (3) the negligent leasing claims failed because Tokai owed no duty of care to Long with regard to the flocking machine. The trial court also entered a Civ.R. 54(B) finding on January 17, 1996.

On appeal, the Longs assert the following assignments of error:

"I. The trial court erred in finding, as a matter of law, that reasonable jurors could not find that appellee satisfied the definition of "supplier" under R.C. § 2307.71.

"II. The trial court erred in failing to consider the evidence presented by appellant concerning the application of R.C. § 2307.78.

"III. The trial court erred in finding as a matter of law that the appellee owed no duty to plaintiff where the product at issue could not have been placed into the stream of commerce but for the involvement of appellee."

With the above facts in mind, we now turn to consideration of appellants' assignments of error.

## I

In support of the first assignment of error, appellants contend that Tokai should be held responsible as a "supplier" because it acted in more than a financial capacity with regard to the flocking machine. Although appellants concede that Tokai's involvement in the selection of the machine was not active, they argue that Tokai exerted sufficient control to be held liable in view of lease provisions requiring that the lessee maintain the machine in accordance with the manufacturer's schedule for preventive maintenance. Further, as satisfaction of the element of possession, appellants refer to the fact that Tokai retained legal title to the machine.

As a starting point for analysis, we note that the pertinent standards for assessing the propriety of summary judgment are well established. As this court previously observed in *Doner v. Snapp* (1994), 98 Ohio App.3d 597, 649 N.E.2d 42:

"The Ohio Supreme Court has interpreted [Civ.R. 56] to say:

" 'The appositeness of rendering a summary judgment hinges upon the tripartite demonstration: (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor.' " *Id.* at 600, 649 N.E.2d at 43–44, quoting from *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47.

In *Doner,* this court also commented:

"In a summary judgment motion, the nonmoving party shoulders the burden to 'produce evidence on any issue for which that party bears the burden of production at trial.' *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus. '[S]ince the propriety of summary judgment is a question of law,' *Children's Med. Ctr. v. Ward* (1993), 87 Ohio App.3d 504, 508, 622 N.E.2d 692, 695, we apply the same standard as the trial court in our review of the court's disposition of the motion; in other words, our review is de novo. *Id.* However, we do not weigh the evidence; we 'accept the evidence properly before [us] and, with respect to the merit issues involved, construe the evidence most strongly in favor of the claims of the party against whom the motion is made.' *Buckingham v. Middlestetter* (Mar. 22, 1993), Montgomery App. No. 13575, unreported, 1993 WL 81827." *Id.*

Applying these standards to the present case, we find that the facts are not in dispute, and reveal that Tokai was not a supplier as defined by R.C. 2307.71. Subsection (M) of that section first defines a product liability claim as follows:

" 'Product liability claim' means a claim that is asserted in a civil action and that seeks to recover compensatory damages from a manufacturer or supplier for death, physical injury to person, emotional distress, or physical damage to property other than the product in question, that allegedly arose from any of the following:

"(1) The design, formulation, production, construction, creation, assembly, re-building, testing, or marketing of that product;

"(2) Any warning or instruction, or lack of warning or instruction, associated with that product;

"(3) Any failure of that product to conform to any relevant representation or warranty."

R.C. 2307.71(O)(1) further defines "supplier" as "[a] person that, in the course of a business conducted for the purpose, * * * leases * * * or otherwise participates in the placing of a product in the stream of commerce." However, this definition is qualified by certain exceptions found in R.C. 2307.71(O)(2), as follows:

" 'Supplier' does not include any of the following:

" * * *

"(d) Any person who acts only in a financial capacity with respect to the sale of a product, or who leases a product under a lease arrangement in which the selection, possession, maintenance, and operation of the product are controlled by a person other than the lessor."

As noted above, appellants claim that Tokai fit within the definition of "supplier" because of certain lease provisions through which Tokai allegedly exercised control over the machine. We disagree.

Applying the plain meaning of the terms in the statute, Tokai was not a supplier for purposes of the Product Liability Act because the selection, possession, maintenance, and operation of the product were controlled by Green—a person other than the lessor. Although Tokai specified in the lease that the lessee should maintain the equipment according to the manufacturer's maintenance schedule, this provision merely safeguarded Tokai's interest in the equipment as collateral for the money expended. Certainly, a prudent lessor would include such a provision in a lease to ensure that the value of the leased equipment would not be excessively diminished during the term of the lease and that, upon default by a lessee, something of value would remain.

More important, we believe the interpretation urged by appellants would unduly burden commerce by imposing liability on banks and other lending institutions who enter into lease transactions not as commercial lessors, but as financial lessors. In this context, courts in a number of jurisdictions have distinguished between financial and commercial lessors for purposes of applying strict liability. See, *e.g.*, *Rivera v. Mahogony Corp.* (1986), 145 Ill.App.3d 213, 98 Ill.Dec. 538, 494 N.E.2d 660.

Before we elaborate on this point, however, a few comments are in order. In their brief, appellants contend that 2 Restatement of the Law 2d, Torts (1965) 347–348, Section 402A, should be applied to decide if Tokai is strictly liable as a lessor. On the other hand, Tokai claims that the legislature, by codifying products liability law, has removed common-law causes of action and concepts such as Section 402A from Ohio law. The Ohio Supreme Court has not ruled precisely on this point. For example, in *McAuliffe v. W. States Import Co., Inc.* (1995), 72 Ohio St.3d 534, 651 N.E.2d 957, the court reversed an appellate decision on the statute of limitations applicable to products liability claims. The appellate court had applied the statute of limitations for liabilities created by statute, based on its finding that the new products liability law codified products liability law, making such actions no longer available at common law. *McAuliffe v. W. States Import Co., Inc.* (Dec. 16, 1993), Cuyahoga App. No. 65297, unreported, 1993 WL 527880. The Supreme Court held that the court of appeals had applied an incorrect test, and should instead have focused on whether the cause of action would not have existed "but for" the new statute. Since products liability actions preceded the adoption of the new law, the Supreme Court concluded that the "but for" test was not satisfied, making the limitations period for liabilities created by statute inappropriate. *Id.* at 538–539, 650 N.E.2d at 960–961.

In its syllabus, the Supreme Court did not rule on whether the products liability law abrogated the common law, but its comments in rejecting the appellate opinion indicate disapproval of a number of the lower court's conclusions about the law. In particular, the Supreme Court rejected the notion that the products liability law had eliminated a cause of action for express warranty. *Id.* at 539–540, 650 N.E.2d at 961. Moreover, the three justices who dissented in *McAuliffe* later commented as follows:

"Given the majority opinion in *McAuliffe*, it should now be understood that all common-law products liability causes of action survive the enactment of R.C. 2307.71 *et seq.*, the Ohio Product Liability Act, unless specifically covered by the Act because the Act, according to the majority in *McAuliffe*, ' * * * falls short of creating a previously unavailable cause of action * * *.' *Byers v. Consol.*

*Aluminum Corp.* (1995), 73 Ohio St.3d 51, 52, 652 N.E.2d 643, 644 (Douglas, J., dissenting)."

In addition, in *Anderson v. Olmsted Utility Equip. Co.* (1991), 60 Ohio St.3d 124, 127, 573 N.E.2d 626, 629, the Supreme Court adopted the theory that for purposes of Restatement Section 402A, a sale can take place in the absence of an actual sale, if the product is placed in the stream of commerce. Although *Anderson* involved claims that arose before the passage of the Ohio Product Liability Act, the case was decided in 1991, almost three years after the passage of the Act. Had the Supreme Court felt the common law to be abrogated, presumably it would not have bothered to extend the common law in *Anderson.* Thus, given the above authority, we cannot agree with Tokai that the passage of the Ohio Product Liability Act abrogated the common law of products liability.

However, this area is unsettled. For example, in *Carrel v. Allied Products Corp.* (July 11, 1995), Marion App. No. 9–94–24, unreported, 1995 WL 423388, the court of appeals held that any tort action arising after the effective date of the Ohio Product Liability Act must conform to the requirements of the Act, and that the Act had also eliminated negligent design claims against manufacturers. This case was recently accepted for review by the Supreme Court. See *Carrel v. Allied Products Corp.* (1996), 74 Ohio St.3d 1501, 659 N.E.2d 316.* ▮ the legislative comments explaining the Ohio Product Liability Act indicate that its coverage is very broad. For example, the author of much of the bill commented as follows about the definition of "product liability claim" in R.C. 2307.71(M):

"The definition is intended to be very broad and to embrace claims challenging virtually any aspect of commercial product design, manufacture, marketing, or warning. The definition does not distinguish one legal theory of recovery (e.g., negligence or strict liability) from another. Whether a civil action includes a 'products liability claim' depends on what is sought and from whom it is sought. If compensatory damages for death, physical injury to person, emotional distress, or physical damage to property other than the product in question are sought based on any of the factual premises enumerated in RC 2307.71(M)(1) to (3), and if the defendant is the manufacturer or supplier of the product in question, the civil action includes a 'product liability claim.'" Darling, Ohio Civil Justice Reform Act (1987) 46.

Darling observed that the original proposed legislation would have codified the Ohio law of products liability, but that the bill as enacted had some differences. *Id.* at 51. However, Darling also made these statements:

"RC 2307.72 provides that 'any recovery of compensatory damages based on a product liability claim' is subject to RC 2307.71 to RC 2307.79. * * * The provisions of RC 2307.71 to RC 2307.80, with one important exception to be discussed, thus control the award of compensatory and punitive damages with respect to 'any product liability claim.' *As to such a claim, those provisions control despite any inconsistent prior Ohio common law.*

" 'Product liability claim' is defined in RC 2307.71(M) so as to embrace virtually every civil claim for compensatory damages from a 'manufacturer' * * * or 'supplier' * * * regardless of the legal theory on which it might previously have been asserted, so long as the claim is based on death, physical injury to person, emotional distress, or physical damage to property other than the product in question, and so long as the claim alleges that such a loss arose from (1) design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of a product, (2) warning, instruction, or lack of warning or instruction associated with a product, or (3) failure of a product to conform to a relevant representation or warranty. To the extent that a civil action includes a 'product liability claim,' it is subject to RC 2307.71 to 2307.80 (and to 2315.20). As noted in the comment to the RC 2307.71(M) definition of 'product liability claim,' a single civil action may, of course, include other types of claim which are not subject to the provisions of RC 2307.71 to RC 2307.80. For a 'product liability claim,' however, the new sections control." (Emphasis added.) *Id.* at 52.[1]

█ The above comments indicate that the legislature's intent in passing the Ohio Product Liability Act was to codify, to the extent possible, the common law of products liability. At the same time, inconsistent common law should be disregarded, and the provisions of the new law control, with the exception of common law relating to claims based on breach of express warranty or misrepresentation.

It is appellant's position, of course, that Section 402A is inconsistent with the requirements of R.C. 2307.71(O)(2). Even if we accept that fact, the Act would still control. However, we do not find any inconsistency between prior common law and this section of the new law. Before 1988, the concept of a commercial lessor's liability had been introduced into Ohio common law. See *Miles v. Gen. Tire & Rubber Co.* (1983), 10 Ohio App.3d 186, 10 OBR 258, 460 N.E.2d 1377. In

---

**1.** The sole exception referred to by Darling is injury by breach of express warranty or misrepresentation. *Darling, supra,* at 55. Darling notes that "if codification is to preempt existing law, it is necessary to add such an artificial fourth type of 'defect,' for the codification will otherwise give manufacturers and suppliers virtual immunity from product liability for product-related express warranties and representations." *Id.* This is consistent with the Supreme Court's rejection in *McAuliffe* of the appellate finding that the legislature eliminated the express warranty cause of action. *McAuliffe, supra,* 72 Ohio St.3d 534, 539, 651 N.E.2d 957, 961.

*Miles,* the action arose from alleged defects in a motor home, and the lessor, a corporation formed for the purpose of leasing motor homes, was granted a directed verdict at the conclusion of the plaintiff's opening statement. *Id.* at 187, 10 OBR at 258–259, 460 N.E.2d at 1378. The court of appeals reversed the directed verdict and followed other jurisdictions that had subjected commercial lessors to products liability claims. The court thus held in its syllabus:

"When determining if a lessor is a 'commercial lessor' so that the theory of strict liability is applicable, the inquiry should be whether the lessor is in the business of leasing the product in the same sense as a seller of a product is in the business of manufacturing, selling or retailing the product." *Id.* at 187, 10 OBR at 258, 460 N.E.2d at 1378.

Application of this doctrine was appropriate in *Miles,* because the lessor in question was undisputably a commercial lessor, being in the specific business of leasing the product in question, much like a seller of mobile homes would be in the business of selling such homes. Subsequently, following the enactment of the Ohio Product Liability Act, the Supreme Court of Ohio cited *Miles* and the commercial-lessor doctrine in a case extending strict liability to certain nonsale situations. See *Anderson, supra,* 60 Ohio St.3d 124, 129, 573 N.E.2d 626, 630.

The approach in *Miles* is consistent with that of other jurisdictions that have considered this issue. Importantly, these cases have distinguished between "commercial" and "financial" lessors, finding no action for strict liability where the lessor is a financial as opposed to a commercial lessor. For example, in *Rivera, supra,* 145 Ill.App.3d 213, 98 Ill.Dec. 538, 494 N.E.2d 660, the defendant was in the business of financing the acquisition of equipment through leases with its customers, but was not in the business of selling the particular kinds of machines involved in the litigation. *Id.* at 214–215, 98 Ill.Dec. at 539, 494 N.E.2d at 661. The purchaser had selected the machine and had obtained a bid from the manufacturer. Although the title remained in the lessor, the lessor never had possession or control of the machine. In rejecting liability on the part of the lessor, the court made the following distinction between financial and commercial lessors:

"A commercial lessor rents the product for a short period of time, generally less than its expected useful life, with the expectation that the product will be returned at the end of the lease period. On the other hand, a financial lessor purchases the product for his customer whose goal is to own the product, leases it to the customer, and does not expect that the product will be returned, but rather expects that the product will be purchased at the end of the period by his customer or that its useful life will have been exhausted." *Id.* at 216, 98 Ill.Dec. at 540, 494 N.E.2d at 662.

Typically, in these kinds of transactions, the lessee selects the equipment and negotiates for the purchase, while the lessor does not participate. *Id.* at 214, 98 Ill.Dec. at 539, 494 N.E.2d at 661. See, also, *Nath v. Natl. Equip. Leasing Corp.* (Pa.1981), 497 Pa. 126, 439 A.2d 633. The fact that title remains in the lessor is not significant, since this would be necessary to protect the lessor's interest in the collateral.

In *Rivera*, the court commented on the reasons that financial lessors should not be held strictly liable, noting that since the lessee has already selected the equipment, the lessor could not be said to be in a position to exert pressure on the manufacturer to enhance the safety of the machine. 145 Ill.App.3d at 217, 98 Ill.Dec. at 541, 494 N.E.2d at 663. These reasons were further elaborated upon in *Nath:*

"It would be novel indeed to suggest that financing agencies should be responsible for detecting defects in the products financed. Such a result would have catastrophic impact upon commerce. Financing institutions are not equipped to pass upon the quality of the myriad of products they are called upon to finance nor do they have direct impact upon the manufacturing process of the product to exercise quality control. Finally, their relationship with a particular manufacturer does not, in the normal course, possess the continuity of transactions that would provide a basis for indirect influence over the condition and the safety of the product." *Id.*, 497 Pa. at 132, 439 A.2d at 636.

The court also noted that while the financier made the purchase possible and to a limited extent, therefore, participated in the delivery of the product, such a "tangential participation" did not warrant imposing strict liability. As the court observed, "the financier is not supplying the chattel but is rather offering the use of money." *Id.*

Similarly, in the present case, Tokai did not participate in the selection of the product or in negotiations about the product. Like the financiers in the cited cases, its role was one of offering the use of money, not of supplying the chattel. Tokai's retention of title and requirement in the lease that the lessee follow the manufacturer's schedule of maintenance were means of preserving the value of the collateral for the money that had been lent. As in *Nath*, this tangential participation does not justify the imposition of strict liability.

Ohio's Product Liability Act follows the commercial/financial lessor distinction, by exempting from the definition of supplier those parties who lease products under a lease arrangement where the possession, maintenance, and operation of the product are controlled by someone other than the lessor. The comments by the primary author of the bill support this distinction, by stating as follows:

"A person who leases a product under a lease arrangement in which the selection, possession, maintenance, and operation of the product are controlled by a person other than the lessor is not a 'supplier.' Though the language of exclusion can be read to refer either to a lessor or a lessee of a product, it is intended to refer to a 'finance lessor' who is technically a commercial lessor of a product, who might therefore otherwise qualify as a 'supplier,' but whose relationship to the product leased is so tenuous as to justify exclusion from imposition of the products liability standards of H.1." Darling, Ohio Civil Justice Reform Act (1987) 47.

Again, there is no inconsistency between this doctrine and the concepts outlined in the above common-law decisions, which have rejected liability on the part of financial lessors. Because we find, under the undisputed facts, that Tokai was a financial lessor, we also conclude that Tokai was not a "supplier" as defined by R.C. 2307.71(O). The undisputed facts reveal that Tokai did not participate in the selection of the flocking machine or in negotiations for its purchase. The lease period of five years was a lengthy one, and Green was given the option to purchase the machine at the end of the lease term. Tokai never had possession of the machine, and despite the fact that the lease specified that the lessee follow the manufacturer's maintenance schedule, an entity other than Tokai exercised the actual control over selection, possession, maintenance, and operation of the machine. Like the other financial lessors in the above cases, Tokai retained title to the flocking machine to protect its interest in the collateral. Thus, on consideration, we see nothing to distinguish this case from those cited above, which found the financial lessors exempt from products liability claims.

In this context, appellants have cited our own decision on reconsideration in *Monnin v. Fifth Third Bank of Miami Valley, N.A.* (1995), 103 Ohio App.3d 213, 658 N.E.2d 1140, as authority for denying summary judgment on the issue of control. While appellants' point is not precisely clear, they seem to be contending that evidence should have been presented in this case to show the intent behind the master lease agreement between Tokai and Green, and that it is the defendant's burden to come forward with such evidence.

In the first place, our examination of the *Monnin* decision reveals its inapplicability, as that case involved negligence claims based on the duty of an owner or occupier of real property to protect persons from dangerous conditions existing on the property. *Id.* at 231, 658 N.E.2d at 1152. Our rationale for reversing summary judgment was that entities other than the occupier might be liable if they sought to occupy the premises by actually directing the activities of the occupant, *i.e.*, in the particular case at hand, by participating in security decisions made at the premises. *Id.* at 232, 658 N.E.2d at 1152. Assuming some arguable relevance of that holding to the present case, there is no evidence in the record

that Tokai ever took any actions in connection with the flocking machine other than to furnish money and prepare a lease agreement. By contrast, in *Monnin,* the facts of record demonstrated actual participation in training, approval of security decisions, and assessment of security measures at the premises by the nonoccupants. *Id.* at 233, 658 N.E.2d at 1153. On that record, we held that issues of fact existed as to control. We see no basis for reaching a similar conclusion here, and find that the trial court was correct in granting summary judgment in favor of Tokai on appellants' products liability claims.

■ By the same token, the trial court correctly granted summary judgment on the breach of warranty and negligent leasing claims. Implied warranty claims are governed by the Product Liability Act, which does not give rise to liability in this case. Express warranty claims are not covered in the Act, but as the trial court noted, Tokai's disclaimer of express warranties in Section 17 of the lease agreement precludes a finding of potential liability on that ground. See *Konicki v. Salvaco, Inc.* (1984), 16 Ohio App.3d 40, 41, 16 OBR 43, 43–44, 474 N.E.2d 347, 348, and *Irving Leasing Corp. v. M & H Tire Co.* (1984), 16 Ohio App.3d 191, 16 OBR 205, 205–206, 475 N.E.2d 127, 128 (lessor is not liable for breach of warranty where express and implied warranties have been disclaimed in lease and rights have been assigned to lessee)[2]

■ As a final matter, we also believe the trial court correctly rejected claims of negligent leasing. In *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318, 544 N.E.2d 265, 270, the Supreme Court observed that "[t]he existence of a duty in a negligence action is a question of law for the court to determine." Based on Tokai's lack of involvement as a financial lessor, we find that Tokai owed no duty to appellants. The sole argument advanced by appellants to establish a duty is the control that Tokai exercised, pursuant to the master lease agreement. As we previously noted, Tokai had no direct involvement with the flocking machine other than as a financial lessor. Under the circumstances, Tokai was not in a position to inspect the product, nor was it required to do so. See *Bickram v. Case I.H.* (E.D.N.Y.1989), 712 F.Supp. 18, 23. See, also, *Starobin v. Niagara Machine & Tool Works Corp.* (N.Y.App.1991), 172 A.D.2d 64, 66–67, 577 N.Y.S.2d 327, 329 (holding that even reservation of right by lessor to inspect leased equipment at any time did not create affirmative duty of care). As a result, Tokai is not liable to appellants based on negligence theories.

The preceding analysis has demonstrated that under the undisputed facts, Tokai is not liable for appellants' injuries under theories of products liability or negligence. Accordingly, the first assignment of error is overruled.

---

2. We also note that appellants did not present any evidence of any express warranties below and have not addressed the issue of express warranty on appeal.

## II

Appellants' second assignment of error is that the trial court failed to consider evidence meriting the application of R.C. 2307.78, which allows a supplier to be charged with manufacturer liability in certain situations. The particular situations contended to be at issue here are that the manufacturer was not subject to judicial process in this state and that the supplier failed to timely respond to a written request for the name and address of the manufacturer. Obviously, a predicate for liability in this instance would be a finding that the defendant is a supplier under the Product Liability Act. Since we have already concluded that Tokai was not a supplier as defined by R.C. 2307.71(O), this assignment of error is moot and need not be addressed.

## III

■ The final assignment of error essentially repeats arguments made in connection with the first assignment of error. Basically, appellants contend that Tokai owed them a duty because the flocking machine would not have been placed into commerce without Tokai's involvement. Again, we reject this position. The point made in many of the cases dealing with financial lessors is that the lessor is placing money into the stream of commerce, not the product. See, e.g., Rivera, supra, 145 Ill.App.3d 213, 217–218, 98 Ill.Dec. 538, 541, 494 N.E.2d 660, 663, and Nath, supra, 497 Pa. 126, 129–133, 439 A.2d 633, 635–636. As the court observed in Abco Metals Corp. v. J.W. Imports Co. (N.D.Ill.1982), 560 F.Supp. 125, affirmed (C.A.7, 1983), 721 F.2d 583:

"The court does not believe that [the lessee] could seriously argue that if it had borrowed money from a bank to pay for the [product], the bank would be liable for any defects." Id. at 133.

Adopting the position urged by appellants would lead to just such a result in the present case, as the undisputed facts indicate that Tokai is a banking corporation providing a range of banking services, including, on occasion, the purchase and lease of items of machinery and equipment. As we observed previously, we reject this concept in view of the potentially severe impact on commerce. Accordingly, the third assignment of error is overruled.

Based on the foregoing discussion, the first and third assignments of error are overruled, and the second assignment of error is moot. The judgment of the trial court is affirmed.

*Judgment affirmed.*

FAIN, J., concurs.

GRADY, J., dissents.

GRADY, Judge, dissenting.

I respectfully dissent from the decision of the majority. While Judge Brogan is quite correct that Ohio follows the commercial/financial lessor distinction in these matters, and has done an excellent review of it, I am not persuaded that the record before the trial court was sufficient for a summary judgment.

The affidavit statement on which it relies simply states that "Tokai Bank of California had no involvement with the selection, maintenance, price, or operation" of the flocking machine. That statement is conclusory. Also, with respect to the matter of control, it fails to trump the requirement in the lease that Green Tokai Co., Ltd. comply with the manufacturer's schedule of preventive maintenance. That provision does not contemplate that Tokai Bank will maintain the machine, but it is some evidence that Tokai Bank controlled its maintenance by requiring the lessee to follow the manufacturer's maintenance protocol, if there was one.

Control is the point of concern for purposes of R.C. 2307.71(O)(2)(d). I believe that, at this stage and on this record, Tokai Bank has failed to demonstrate, under the analytical standards imposed by Civ.R. 56(C), that it had a lack of control sufficient to remove it from the supplier classification. I would reverse and remand.