OPINION *Page 2 
{¶ 1} Plaintiffs-appellants Brenda Russell, Henry Mobley, and Brenda Mobley appeal from a judgment on the pleadings and summary judgment in favor of defendants-appellees Grubb Ellis Management (Grubb) and Michael Nolan. Brenda Russell and Henry Mobley were employees of Grubb who were allegedly injured in the course of their employment. The trial court found that the complaints filed by Russell and the Mobleys failed to allege facts sufficient to state a claim for intentional tort. The trial court alternatively found, based on the undisputed facts, that Grubb and Nolan were entitled to summary judgment on any intentional tort claims.
 {¶ 2} Russell and the Mobleys contend that the motions to dismiss were improperly granted because their complaints stated a claim for relief for intentional tort. They also contend that genuine issues of material fact exist regarding whether their employer committed an intentional tort.
 {¶ 3} We conclude that the trial court erred in dismissing the complaints and in rendering summary judgment on the intentional tort claims. Accordingly, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings.
 I {¶ 4} In 1999, Lexis-Nexis (Lexis) and Grubb were parties to a Property *Page 3 
Management Services Agreement. Under the agreement, Grubb was responsible for maintenance, including security, pest control, and pesticide operations, on the Lexis premises, which included ten buildings. Brenda Russell and Henry Mobley were employed as security personnel for Grubb, and both worked at the Lexis premises. Russell was a security control officer and Mobley was a security rover.
 {¶ 5} Russell was stationed in the Security Control Center (SCC), which was located in Building Four, immediately adjacent to the Lexis cafeteria and kitchen. In early 1999, the kitchen developed a gnat problem. Prior to this time, Grubb had hired Allied Pest Control, Inc. (Allied), to perform routine monthly pest control services at Lexis. Ed Cantwell was the Allied employee who was responsible for the Lexis route.
 {¶ 6} Cantwell applied a general pest spray three times, but was unsuccessful in eliminating the gnats. After speaking with Mike Nolan (Grubb's property manager) about the problem, Cantwell consulted with another Allied employee, John Zerkle, regarding the best treatment option. The record is somewhat unclear on this point, but it appears that Zerkle and Cantwell decided to use a cylinder bomb (or fogger). In this process, the cylinder bomb is triggered and shoots a dust cloud of chemicals straight up into the air. In contrast, during misting, tiny droplets of water particles are emitted. In either situation, however, the chemicals dissipate in a couple of minutes. The mist or fog does not last for an hour and a half to two hours.
 {¶ 7} According to the Defendants, the precautions are the same whether misting or fogging is used. Allied and Nolan discussed these precautions and what preparation would be required. For example, all ventilation, heating, air, pilot lights, and furnaces or hot water heaters in the area were to be turned off, because the material being emitted was *Page 4 
flammable.
 {¶ 8} Another precaution was that the area in which the fogger was being applied was to be vacated for three to four hours. The only reason a three-to four-hour period was recommended was because of the odor. People confuse odors with these chemicals, but the chemicals are not what smell; the smell comes from the petroleum distillates, or emulsifiers, that are used to make the chemicals adhere to surfaces. The odors also do not pose any danger to humans. The area of concern or severe danger is in the actual area that is being misted or fogged, and even then, only when the fogging or misting is actually occurring.
 {¶ 9} The last precaution was that all areas were to be wiped down after the treatment was finished and the three-to four-hour period had passed. The treatment leaves some residue that is transparent, but can be felt.
 {¶ 10} The area to be treated was the kitchen of the Kwic Bytes cafeteria, which was located next to the SCC where Russell was stationed. The kitchen and SCC share a common wall, extending all the way from the floor to the ceiling. According to the Allied representative, the mist or fog would not penetrate through the walls into another room. A pesticide can be safely applied in one room, so long as the doors are closed, and an occupant can sit in the next room without being adversely affected by the application. An odor might be present, but again, the odor is not a health hazard. The fog or mist is not like smoke and does not travel under doors.
 {¶ 11} Consistent with Allied's instructions, Grubb and Lexis scheduled the procedure for 7:00 to 7:30 p.m. on a Friday evening, when most employees would have left the building for the day. A crew was also scheduled to come in over the weekend to clean *Page 5 
the area before Kwic Bytes opened for business again on Monday.
 {¶ 12} Grubb's security operations manager was Dean Williams, who managed the security force and reported to Nolan. Williams was on duty on February 19, 1999, which was the day the fogging was performed. Williams worked the day shift, leaving around 5:00 p.m. that evening. Early in the afternoon, Williams sent an e-mail to the computer in the SCC and to various Grubb employees, indicating that Ed Cantwell would be coming in that evening to do pest control. The e-mail stated that Cantwell would be "bombing" the kitchen and that when the area in the kitchen was bombed, it would be off limits for three hours immediately afterwards. In addition, the e-mail said that the pilot lights were being turned off.
 {¶ 13} Both Russell and Mobley worked second shift that evening, from 3:00 p.m. to 11:00 p.m. Russell was not copied on the e-mail, but the computer in the control center where she worked in Building Four received the e-mail, and Russell would have had the duty to open the e-mail and read it. In addition, the security supervisors (in this case, Sergeant Bill Tifft) were to pass messages like this one on to subordinates. Since Mobley was a rover and was not stationed in the SCC, one of the second shift supervisors (either Tifft or Ken Orndorf) would have relayed the message to Mobley.
 {¶ 14} Mobley testified that Tifft informed both him and Russell that Allied would be coming in that evening around 7:00 or 7:30 p.m. When Tifft gave Russell the paperwork for Allied, he told her that Allied was coming in to spray for gnats in the kitchen. The kitchen area was open to the cafeteria and a wire mesh gate came down to secure the kitchen area.
 {¶ 15} Mobley ate his lunch in the cafeteria area and finished around 6:30 p.m. The *Page 6 
cafeteria was closed and no one else was in the cafeteria or kitchen. Around 7:30 p.m., Mobley was getting ready to leave the premises to patrol the other buildings to which he was assigned, when Russell paged him. Russell said Allied was seeking entrance at the lobby or front door of Building Four. Mobley then let Cantwell in the building and signed him in. Cantwell explained that he was there to set off two bug bombs. Cantwell told Mobley that no one was supposed to be in the area and that the ventilation system should be shut down. Mobley's understanding was that no one was supposed to be in the kitchen area.
 {¶ 16} Russell testified during her deposition about having "heard" about a remark that Cantwell made about not being able to able to set off the pesticide with humans present. Allegedly, Cantwell made this remark to Nolan. In response, Nolan purportedly told Cantwell that if he did not set the pesticide off, Nolan would find someone else to do the job. When questioned about where she had heard about these remarks, Russell testified that Cantwell had told Mobley or "someone in the near area of Mobley" about the remark. When Russell was asked during her deposition whether Mobley was the only source of information for those remarks, the following further exchange occurred:
 {¶ 17} "A. No, sir.
 {¶ 18} "Q. Who else did you hear that from?
 {¶ 19} "A. Mr. Cantwell approached me approximately 7:30 in the control center to pick up his work orders to set the pesticide off. He stated to me that he had also spoken with Mike Nolan, that he was not allowed to set that particular pesticide off in an environment where humans were at, that the building had to be evacuated, that Mike Nolan had told him per Ed Cantwell that by God, if you don't set it off, I'll contact somebody else. *Page 7 
That was spoken directly to me, sir.
 {¶ 20} "Q. Did Mr. Cantwell tell you the entire building had to be evacuated?
 {¶ 21} "A. He said no humans were to be present. That would mean-
 {¶ 22} "Q. In the entire building or in the kitchen.
 {¶ 23} "A. No, sir, I was in the control center. I wasn't supposed to be there.
 {¶ 24} "Q. Did he tell you to leave the control room?
 {¶ 25} "A. No.
 {¶ 26} "Q. What did he tell you?
 {¶ 27} "MR. HUNT: You mean, other than what she already said?
 {¶ 28} "Q. Well, he said no humans were to be present in the building. What did you understand the building to be, the entire building?
 {¶ 29} "A. In the area where he was setting this off, sir.
 {¶ 30} "Q. And that's what I'm trying to find out. Before you said he said there should be no humans in the building. Did you take that to mean the entire building, the area where the bug bomb was being set off? Where, if you had any understanding, was Mr. Nolan referring to?
 {¶ 31} "A. I would take that to be the entire building." (Russell deposition, pp. 47-48.)
 {¶ 32} Despite having heard these comments, Russell took no actions to clear the building. She did not contact her supervisor, Tifft, nor did she notify him that the building had to be cleared. Russell made no attempt to contact Tifft, even though she had been told to contact her supervisor if she had a problem that she did not have authority to handle, or if she were concerned for her own safety. *Page 8 
 {¶ 33} Mobley let Cantwell into the kitchen area and then left the building to do his rounds. Russell testified that Tifft relieved her around 9:00 p.m. for a restroom break and told her that the bomb had already been set off. Tifft told Russell to go to the restroom adjacent to the dining area, not to the closer restroom by the kitchen. Russell noticed the pesticide odor, which was an offensive odor. She first noticed it as soon as she exited the control center to go down the hallway. It got worse as she got closer to the dining room and she could still smell it in the restroom.
 {¶ 34} Russell stated that her eyes were burning and she started coughing. Tifft then left and went to another building to relieve another guard. Cantwell was apparently still there and told Russell that he was going to the kitchen to get her a gallon of milk. Cantwell returned with the milk and told Russell to drink as much as fast as she possibly could.
 {¶ 35} About five minutes after Tifft left, Russell called him and said that she could not handle this and that something was wrong. By that time, Mobley had returned from his rounds. Tifft then told Mobley to take a fan over to the SCC.
 {¶ 36} Mobley testified that he smelled fumes when he got in the lobby of Building Four and had a reaction to it. His eyes burned and his nose and throat felt dry. When Mobley checked on Russell in the SCC, she was in a cloud of white, grayish-looking dust. The dust was all over the SCC, covering everything, including the chair, control panel, and TV screens. Russell had a wet rag over her face, trying to breathe.
 {¶ 37} Russell described a white fog that "billowed out" when Mobley arrived. She claimed that Mobley told her to "get the hell out," so she ran to the dock behind Building Four, where she coughed and vomited for a while. Russell indicated that she also saw a *Page 9 
"white cloud" in the hallway when she walked down the hall toward the kitchen and toward the dock.
 {¶ 38} Mobley testified that he stayed in the SCC for fifteen or twenty minutes until he was relieved by Tifft. While Mobley was in the SCC, there was a partial cloud in the room, which Mobley tried to dissipate by pointing the fan to blow the cloud out the door. This took about twenty minutes. Mobley also cleaned off the desk area.
 {¶ 39} After Tifft relieved Mobley, Mobley did another check of buildings and arrived back at the SCC around 10:10. In the meantime, Russell returned to the SCC and told Tifft that she was going to the hospital. Russell took a pesticide label that Cantwell had left, which indicated that the drug in question contained 3% Resmethrin. When Mobley returned to the SCC, he stayed there until the shift ended at 11:00 p.m. Mobley also worked in the SCC on Saturday and Sunday, and claimed he had headaches, a hard time breathing and swallowing, and had tightness in his chest. He first sought medical attention on Monday.
 {¶ 40} Russell went to Miami Valley Hospital the night of the incident and then went to Good Samaritan Hospital two days later. She returned again to Good Samaritan several days later.
 {¶ 41} There was some dispute about the chemical that was actually used for fogging. While the label that Russell took indicated that it contained Resmethrin, Allied's manager testified that Cantwell used a chemical called "A20." However, the precautions to be used for both chemicals were the same. According to Allied, these chemicals do not emit a white dust that is visible or obviously visible.
 {¶ 42} Grubb's Mechanical Operations Manager, John Keefe, testified that the wall *Page 10 
between the kitchen and SCC is a fire-rated wall that is designed to keep flames, smoke, and other materials from being emitted from the kitchen to adjacent rooms. Keefe further indicated that there were no known defects between the walls. In addition, Keefe stated that the SCC had a separate air-conditioning unit because of the heat generated by the equipment in the office, and that the air-conditioning was operated all year. Finally, Keefe stated that all pertinent times, the SCC was closed off from the regular hearing, ventilating and air-conditioning system that operated in Building Four, so that the separate air-conditioning unit could perform its function.
 {¶ 43} In February, 2000, Mobley and his wife, Brenda, filed a complaint against Grubb, Lexis, Allied, and Marriott, d.b.a. Kwic Bytes, alleging that they negligently and intentionally caused injury to Mobley. Subsequently, in February, 2001, Russell filed a complaint against Nexis, Nolan, Grubb, Allied, and Cantwell, alleging that they had committed acts of negligence and willful or wanton misconduct that injured Russell. After the defendants filed motions to dismiss and motions for summary judgment in April, 2002, the Mobleys and Russell voluntarily dismissed their complaints under Civ. R. 41(A) (1 )(a). The complaints were re-filed with the same claims and the same defendants, other than Marriott, in April, 2003. Nolan and Grubb then filed motions to dismiss and motions for summary judgment, which were granted by the trial court. From these adverse judgments, Russell and Mobley appeal.
 II {¶ 44} Russell's First Assignment of Error is as follows:
 {¶ 45} "THE TRIAL COURT ERRED IN GRANTING THE DEFENDANT'S MOTION *Page 11 
TO DISMISS."
 {¶ 46} The Mobleys' First Assignment of Error similarly states that:
 {¶ 47} "THE TRIAL COURT ERRED IN GRANTING THE DEFENDANT'S MOTION TO DISMISS BECAUSE PLAINTIFF SUCCESSFULLY ALLEGED AN INTENTIONAL TORT CLAIM IN THE COMPLAINT."
 {¶ 48} In concluding that the Russell and Mobley complaints should be dismissed, the trial court relied on Mitchell v. Lawson Milk Co. (1988),40 Ohio St.3d 190, 532 N.E.2d 753, which established the following heightened pleading requirement for intentional tort claims:
 {¶ 49} "A claim of intentional tort against an employer will be dismissed as failing to establish that the pleader is entitled to relief unless the complaint alleges facts showing that the employer: (1) specifically desired to injure the employee; or (2) knew that injury to an employee was certain or substantially certain to result from the employer's act and, despite this knowledge, still proceeded." Id. at syllabus (citations omitted).
 {¶ 50} The Ohio Supreme Court noted in Mitchell that unsupported conclusions would not be taken as admitted by a motion to dismiss, and would not be sufficient to withstand the motion to dismiss.40 Ohio St.3d at 193. Nonetheless, the court stressed in a footnote that "the more complete consideration afforded under Civ. R. 56 (summary judgment) would avoid problems which arise when it is difficult to distinguish `unsupported conclusions' from `facts' in a pleading." Id. at n. 3.
 {¶ 51} In the present case, the trial court quoted facts from the complaint in Mitchell, observed that the allegations in the present case were similar, and dismissed the complaints. In this regard, the trial court relied heavily on the fact that Grubb's property *Page 12 
manager, Nolan, was present in the building when the pesticide was applied. Specifically, the trial court stated that:
 {¶ 52} "Plaintiff Russell claims that Defendant Noland was told that the building should be evacuated and upon being told such stated that if Allied did not perform the service he would find someone who would. However, it is hard to find intent or substantial certainty in such an allegation. Noland was also present in the building that Russell claims should have been evacuated. It is hard to believe that Noland would have ordered a procedure done in a building in which he was present had injury been intended or substantially certain to occur. Based on that reasoning if Noland was present in the building he too would have had to evacuate or subject himself to almost certain injury. It is hard to find the required intent to harm Plaintiff Russell when to do so would also logically lead to the conclusion that Noland intend [sic] to injure himself as well or was substantially certain that he himself would also be injured." Doc. #51, p. 8.
 {¶ 53} These statements are incorrect. The individual in question was Michael Nolan (whose name was misspelled as "Noland" by both Russell and the trial court). As we noted earlier, Nolan was Grubb's property manager at the time of the incident. The complaints do not state that Nolan was present in Building Four when the pesticide was being applied. The depositions filed with the trial court also do not contain any evidence indicating that Nolan was present when the pesticide was applied. The trial court may have assumed that Nolan was present, based on vague wording in Russell's complaint, but the complaint never states that Nolan was present in Building Four. Furthermore, since the court went on to decide the summary judgment motions, it should have been aware of the lack of evidence that Nolan was anywhere on the premises of Building Four during the *Page 13 
evening the pesticide was applied.
 {¶ 54} The depositions filed with the court specifically identify only the following individuals as having been present in Building Four during the evening that the pesticide was applied: (1) Russell; (2) Mobley; (3) Cantwell; and (4) Tifft. Russell's deposition also mentions "Bruce," a second-shift maintenance man, who allegedly smelled the pesticide on the sixth or seventh floor of Building Four the night of the incident, and some "housekeeping people" who were supposedly in the cafeteria area that night. Russell did not know who the housekeeping people were.
 {¶ 55} The depositions indicate that Nolan had an office on the Lexis premises. However, the Lexis "premises" included ten buildings, and there was no testimony placing Nolan's office in Building Four.
 {¶ 56} The evidence does reveal that Nolan discussed the gnat problem with Cantwell at some point prior to February 19, 1999. Nolan also participated in a conference call with Cantwell, Williams, and the cafeteria manager to discuss possible options for solving the gnat problem. This conference call took place sometime during the week before the pesticide was applied. Obviously, the comments attributed to Nolan could have been made during Nolan's initial discussion with Cantwell or during the conference call. In fact, the only reasonable inference from the evidence is that if Nolan made any comments along these lines, he would have done so on one of these occasions. Specifically, there is no evidence that Cantwell spoke to Nolan at any other time, including any time after Cantwell arrived at Lexis the night of February 19, 1999.
 {¶ 57} As we noted earlier, Mobley was the person who signed Cantwell into Building Four that evening. Mobley took Cantwell directly to see Tifft, and then took *Page 14 
Cantwell to the kitchen after Cantwell had spoken with Tifft for a few minutes. The record is devoid of any evidence indicating that Nolan either was in Building Four, or spoke to Cantwell the night that the pesticide was applied.
 {¶ 58} Accordingly, the trial court's decision is based on incorrect assumptions — a danger that exists when cases are dismissed on the pleadings rather than being tested more thoroughly by summary judgment.Mitchell, 40 Ohio St.3d at 193, n. 3.
 {¶ 59} We do note that the Mobleys' complaint was not as specific as the Russell complaint. Had the Mobleys' complaint stood alone, it may have been subject to dismissal under the heightened pleading standard inMitchell. However, the two cases were consolidated, and the trial court had both complaints before it. Furthermore, the trial court's decision to consider the summary judgment motions, as well as the evidence that was before the court in that regard, effectively undermined the court's rationale for granting judgment on the pleadings. Under these circumstances, the court also erred in dismissing the Mobleys' complaint.
 {¶ 60} Based on the preceding discussion, Russell's First Assignment of Error and the Mobleys' First Assignment of Error are both sustained.
 III {¶ 61} Russell's Second Assignment of Error is as follows:
 {¶ 62} "THERE EXISTS A GENUINE ISSUE OF MATERIAL FACT THAT THE EMPLOYER COMMITTED AN INTENTIONAL TORT WHICH IS TO BE PROPERLY DETERMINED BY A JURY."
 {¶ 63} The Mobleys' Second Assignment of Error similarly states that: *Page 15 
 {¶ 64} "THE TRIAL COURT ERRED IN GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BECAUSE PLAINTIFF MOBLEY ESTABLISHED THE REQUISITE ELEMENTS OF THE CLAIM AND PLAINTIFF MOBLEY SUCCESSFULLY MET THE BURDEN TO OVERCOME A MOTION FOR SUMMARY JUDGMENT."
 {¶ 65} "A trial court may grant a moving party summary judgment pursuant to Civ. R. 56 if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." Smith v. FiveRivers MetroParks (1999), 134 Ohio App.3d 754, 760, 732 N.E.2d 422. We review decisions granting summary judgment de novo, which means that we apply the same standards as the trial court. Broadnax v. Greene CreditService (1997), 118 Ohio App.3d 881, 887, 694 N.E.2d 167, and Long v.Tokai Bank of California (1996), 114 Ohio App.3d 116, 119,682 N.E.2d 1052.
 {¶ 66} The claims against Grubb and Nolan are based on intentional tort, which is an exception to the workers' compensation exclusive remedy doctrine that was first recognized when the Ohio Supreme Court allowed employees to bring intentional tort claims against their employers. Hannah v. Dayton Power Light Co., 82 Ohio St.3d 482, 484,1998-Ohio-408, 696 N.E.2d 1044. The Ohio Supreme Court has defined an intentional tort as "an act committed with the intent to injure another, or committed with the belief that such injury is substantially certain to occur." Id., citing Jones v. VIP Dev. Co. (1984), 15 Ohio St.3d 90,472 N.E.2d 1046, at paragraph one of the syllabus.
 {¶ 67} After defining an intentional tort, the Ohio Supreme Court subsequently *Page 16 
focused on the proof necessary to establish "intent." In Van Fossen v.Babcock Wilcox Co. (1988), 36 Ohio St.3d 100, 522 N.E.2d 489, the court adopted a three-part test, and then later modified the test to require that employees prove:
 {¶ 68} " `(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.' " Hannah,82 Ohio St.3d at 484, quoting from Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115,570 N.E.2d 1108, at paragraph one of the syllabus.
 {¶ 69} In rendering summary judgment for Grubb and Nolan, the trial court focused on the fact that to Grubb's knowledge, the SCC was totally isolated from the rest of the building, preventing passage of a mist, spray, or dust into the SCC. In addition, the court again stressed the fact that Nolan would not have ordered a dangerous application, since Nolan was in the building at the time. As we have already noted, the trial court's factual finding that Nolan was in the building is not supported in the record.
 {¶ 70} The court was also incorrect in focusing on the fact that the SCC was allegedly isolated from the rest of the building, due to a separate ventilation system. The evidence does not indicate that this point was discussed before the pesticide application, or that it factored into Grubb's decision.
 {¶ 71} Our review of the evidence indicates that one of two scenarios existed, depending on which party the fact-finder believes. The first scenario is that Grubb was told *Page 17 
that the pesticide was not harmful to humans and did not pose any risk, even if an individual walked into the room being fogged right after the application. The reason for the three-or four-hour restriction on entering a fogged area was due simply to the odor, which was not harmful. Under this scenario, there would have been no reason to consider whether the dust or spray could be transmitted to an adjacent room, because Grubb was assured that no danger existed. Moreover, the importance of closing off ventilation was not based on the potential escape of chemicals harmful to humans; instead, the ventilation systems were to be closed because the petroleum distillates could return through cold air vents to areas like furnaces, where they could become flammable.
 {¶ 72} The second scenario is that Grubb was very concerned about the gnat problem at its customer's premises and the failure to successfully control the problem during 2Cantwell's three prior attempts in January. Under this scenario, Grubb was warned that the pesticide was hazardous to humans and that the building had to be evacuated in order for the product to be safely applied. Despite this warning, Grubb required Allied to use the pesticide when Grubb employees were present, and also required its employees to work in the building, despite knowing of the substantial certainty that employees would be harmed by the chemicals. In this scenario, the issue of separate ventilation for a particular room would also be irrelevant, since the entire building was supposed to be evacuated.
 {¶ 73} The parties did not submit any testimony from Cantwell to dispute the version offered by Russell. Allied's manager testified that Cantwell had denied making the remarks in question to Russell, but this simply creates an issue of fact. While a jury may choose to disbelieve Russell, credibility decisions cannot be resolved through summary judgment. *Page 18 
Accordingly, the trial court erred in rendering summary judgment in favor of Grubb and Nolan.
 {¶ 74} Russell's Second Assignment of Error and the Mobleys' Second Assignment of Error are both sustained.
 IV {¶ 75} All of the assignments of error having been sustained, the judgment of the trial court awarding summary judgment in favor of Grubb Ellis Management, Inc., and Michael Nolan is Reversed, and this cause is Remanded for further proceedings consistent with this opinion.
 WOLFF, P.J., and WALTERS, J., concur. *Page 1