OPINION.
{¶ 1} Plaintiff-appellant, Christopher Sheets, appeals the summary judgment granted by the Hamilton County Court of Common Pleas in a personal-injury action against defendants-appellants, Karl W. Schmidt Associates, Inc. ("Schmidt"), American Baler Company ("AMBACO"), and RPS Leasing, Inc. ("RPS"). For the following reasons, we affirm the judgment of the trial court.
 {¶ 2} In 1998, Sheets was employed by Ohio Valley Carton ("OVC"). He operated a baler manufactured by AMBACO. OVC had leased the baler and its conveyor system from RPS under an agreement whereby OVC was to own the machine at the end of the lease's term.
 {¶ 3} Sheets's job was to load scrap cardboard onto the conveyor system, which then fed the scrap into the hopper of the baler. Schmidt was the manufacturer of the conveyor belt that fed the scrap directly into the hopper. When the baler was fed a set amount of scrap, a ram located in the baler compressed the scrap into a bale. Sheets then tied the bale and removed it from the machine.
 {¶ 4} AMBACO had affixed six separate warnings to the machine used at OVC. Foremost among these was the admonition that employees were to lock-out/tag-out the machine prior to performing maintenance on the machine. The lock-out/tag-out procedure involved the mere turning of a key that would disconnect all power to the machine. The baler also included warnings that there was a "crush area" inside the machine and that there was a risk of "severe injury or death" posed by the moving parts inside the machine. Sheets testified that he had read the warnings and understood them. One of the two conveyors in the machinery system warned users never to climb onto the conveyors.
 {¶ 5} In addition, AMBACO provided OVC with a guide to safe baler operation. The guide emphasized the need to lock-out/tag-out the machine before attempting maintenance. The guide also instructed users to refrain from overloading the hopper. Sheets testified in his deposition that he had not read the guide to safe operation, although the guide itself stated that it was required reading for all operators of the baler.
 {¶ 6} Sheets testified that, periodically, the amount of scrap fed into the baler caused the machine to jam. On December 10, 1998, such a jam occurred. Sheets testified that he turned off the machine with the on/off switch and then attempted to remove the jam. He stated that he did not lock-out/tag-out the machine because the key required to do so had been broken for some time.
 {¶ 7} In attempting to remove the jam, Sheets first opened the side door of the baler. The opening of the door automatically caused the machine to shut down. Sheets was unable to remove the jam from the side door, so he closed the door and climbed onto the housing of the machine and attempted to use a pole to clear the jam through the opening of the hopper. When this proved unsuccessful, Sheets again opened the side door and attempted to remove the jam through the side of the machine. When this again failed, Sheets closed the door and climbed onto the conveyor system.
 {¶ 8} After he had reached the top of the conveyor that was adjacent to the baler's hopper, Sheets again used the pole to try to loosen the jam. In doing so, he lost his balance and fell headfirst into the baler. When he stood up, the baler activated and crushed his legs, which were ultimately amputated.
 {¶ 9} Sheets sued OVC under a theory of intentional tort. After a settlement was reached, Sheets voluntarily dismissed the claim against OVC. He sued the appellees under theories of products liability, negligence, and breach of warranty. After extensive discovery, the appellees filed motions for summary judgment, which the trial court granted. In a single assignment of error, Sheets now argues that the trial court erred in granting summary judgment in favor of the appellees.
 {¶ 10} Pursuant to Civ.R. 56(C), a motion for summary judgment is to be granted only when no genuine issue of material fact remains to be litigated, the moving party is entitled to judgment as a matter of law, and it appears from the evidence that reasonable minds can come to but one conclusion, and, with the evidence construed most strongly in favor of the nonmoving party, that conclusion is adverse to that party.[1]
The party moving for summary judgment bears the initial burden of demonstrating that no genuine issue of material fact exists, and once it has satisfied its burden, the nonmoving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial.[2]
 {¶ 11} We begin with a discussion of the products-liability claims against AMBACO. To prevail on a products-liability claim, the plaintiff must demonstrate by a preponderance of the evidence that (1) there was a defect in the product manufactured and sold by the defendant; (2) the defect existed at the time the product left the hands of the defendant; and (3) the defect was the direct and proximate cause of the plaintiff's injuries or loss.[3]
 {¶ 12} We first note that even Sheets's experts conceded that, had Sheets followed the directive to lock-out/tag-out the machine, the main power to the machine would have been disconnected, and the injuries that Sheets suffered would not have occurred.[4] Accordingly, we view Sheets's misuse of the machine as the direct and proximate cause of his injuries.[5] Nonetheless, because the remaining safety features of the machine could be regarded as supplements or complements to the lock-out/tag-out procedure, we address each of Sheets's arguments with respect to alleged defects.
 {¶ 13} The primary defect cited by Sheets was the lack of a recessed start button on the main control of the baler. Sheets claims that the lack of a recessed start button constituted a manufacturing defect under R.C. 2307.74 and 2307.77. R.C. 2307.74 provides that "[a] product is defective in manufacture or construction if, when it left the control of its manufacturer, it deviated in a material way from the design specifications * * * or performance standards of the manufacturer." Under R.C. 2307.77, a product is defective if it was not manufactured in conformity with a representation made by the manufacturer.[6]
 {¶ 14} We find no merit in Sheets's argument. Even were we to conclude that the absence of a recessed start button was a defect in the baler, we would be constrained to conclude that Sheets failed to demonstrate that the defect had caused his injuries. Sheets's experts, Dr. Richard Forbes and Dr. Robert Cunitz, both hypothesized that, after Sheets had closed the side door of the baler in an attempt to clear the jam, he had inadvertently bumped or kicked the start button when he climbed onto the housing of the baler. They opined that, if the baler had been equipped with a recessed start button, the inadvertent starting of the machine would have been impossible.
 {¶ 15} We find the experts' conclusions to be flawed for two reasons. First, Sheets did not testify in his deposition that he had had any contact with the start button before he climbed onto the housing of the baler. Under these circumstances, the experts' opinions as to the cause of the machine's activation were based upon mere speculation.
 {¶ 16} More importantly, though, their opinions were based upon a misapprehension of the events as Sheets himself had related them. Sheets stated that, after he had climbed onto the housing of the baler, he had returned to the side of the baler and opened the door a second time. It is conceded that the opening of the door would have again turned the machine off. After opening the door a second time, Sheets did not again climb onto the housing of the baler or otherwise come into proximity to the start button on the main control panel. Instead, he closed the door and climbed up the conveyor belt in an attempt to remove the jam. Therefore, the experts' theory of accidental activation by means of a bumping or kicking of the start button was inconsistent with the uncontroverted facts of the case.[7] The absence of a recessed start button was negated as a cause of the injuries, and thus any defect in design or manufacture with respect to the button could not have been the cause of the accident.[8]
 {¶ 17} A second asserted cause of the activation of the machine was a flaw in the baler's circuitry. But as Sheets concedes, he did not produce any evidence of a problem in the baler's electrical system. When questioned about a report by the Occupational Safety and Health Administration that had listed no defects in the machine's circuitry, Sheets's experts were unable to offer any competent evidence to rebut OSHA's conclusion and in fact conceded that they had not examined the baler's electrical system.
 {¶ 18} Sheets also argues that the warnings on the baler were inadequate. We find this argument to be without merit. Pursuant to R.C.2307.76, a product is defective due to inadequate warning if the manufacturer knew or should have known of a risk associated with the product that allegedly caused harm for which the plaintiff seeks damages and the manufacturer failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the plaintiff seeks compensation and in light of the likely seriousness of that harm.
 {¶ 19} In the case at bar, we find no error in the trial court's rejection of Sheets's warning claim. As the trial court found, the baler contained numerous warnings that it could cause severe injury. These included an explicit warning that the inside of the baler was a crush zone to be avoided while the machine's power supply was connected. Sheets testified that he had read and understood the warnings. As we have already noted, it was Sheets's failure to heed the lock-out/tag-out directive that had ultimately caused his injuries,[9] and Sheets has failed to explain how more extensive or explicit warnings would have prevented his loss. His argument that AMBACO should have provided more information on clearing jams ignores the fact that the lock-out/tag-out procedure was a required part of any maintenance on the machine. Accordingly, we find no error in the trial court's decision.
 {¶ 20} Sheets next contends that, pursuant to R.C. 2307.75, the baling system was defective because the foreseeable risks associated with its design exceeded the benefits associated with the design, and because it was more dangerous than an ordinary consumer would have expected when it was used in its intended manner.[10] In support of this argument, he cites the machine's propensity to jam and the necessary maintenance that the jams entailed.
 {¶ 21} We are not persuaded that Sheets demonstrated a genuine issue of fact with respect to this asserted defect. Although Sheets casts the jamming as a design problem and posits alternative systems to prevent jamming, he cites no expert testimony or other competent evidence indicating that the baler was inappropriate for its intended use at OVC. In fact, the uncontroverted evidence was that the jams were caused by the failure of OVC employees to cut the cardboard scrap into pieces small enough for the baler to accommodate. Sheets concedes that the subsequent implementation of this solution eliminated the jamming problem.[11]
Under these circumstances, we agree with the trial court's conclusion that jamming was in fact a result of the misuse of the product by OVC employees. Sheets failed to demonstrate that the baler was unreasonably dangerous when used as intended, and the trial court properly rejected this claim under R.C. 2307.75.
 {¶ 22} The final defect that Sheets attributes to the baler was the broken key in the lock-out/tag-out switch. Sheets argues that the key was manufactured defectively and that the defect prevented him from following the instruction to disconnect the power supply before attempting to clear the jam. We find no merit in this argument. Sheets presented no evidence that the breaking of the key was the result of a manufacturing defect and in fact did not even identify the broken key as a defect in the trial court. The evidence adduced during discovery established that the key broke after the baler was delivered to OVC. The evidence further indicated that the duty to replace the key fell solely on OVC and that OVC had failed to remedy the problem despite being informed of the situation by employees. Accordingly, we find no error in the trial court's grant of summary judgment to AMBACO on Sheets's products-liability claims.
 {¶ 23} We turn now to the products-liability claims against Schmidt. Sheets first argues that a genuine issue of material fact existed as to whether the conveyor was defective because it exacerbated the problem of jamming in the baler. We hold that our previous discussion with respect to AMBACO's liability applies equally (if not more forcefully) to Schmidt. As we have already noted, Sheets failed to demonstrate that the problem with jamming was a design defect in the machinery, as the evidence indicated that the jamming was caused by the OVC employees' failure to cut the cardboard scrap into pieces sufficiently small to be processed by the baler. And while there was some discussion by Sheets's experts concerning a gap between the top of the Schmidt conveyor and the hopper of the baler, we agree with the trial court that such a gap presented only a risk of cardboard falling to the floor and not a danger of overloading the baler.
 {¶ 24} Sheets also argues that Schmidt had failed to warn of the dangers posed by climbing onto the conveyor. We disagree. As the trial court properly held, Sheets's climbing onto the conveyor was not a proximate cause of the injuries that occurred when the baler activated. Sheets's experts conceded that the dangers posed by climbing onto the conveyor system were related to falling and did not directly relate to the crushing of Sheets's legs. Moreover, the experts conceded that Schmidt's duty to warn did not extend to the baler that AMBACO had manufactured, because the conveyor was sold merely as a component, not as part of an integrated baler system. Because Sheets failed to demonstrate that the alleged inadequacy of Schmidt's warnings was the proximate cause of the injuries, the trial court was correct in granting summary judgment in favor of Schmidt on Sheets's products-liability claims.
 {¶ 25} Sheets also argues that there were genuine issues of material fact with respect to RPS. He argues that RPS was a commercial lessor that bore the same responsibility as the manufacturer of the baler.
 {¶ 26} We find no merit in Sheets's argument. Under R.C.2307.71(O)(2)(d), a "supplier" of a product is defined to specifically exclude "[a]ny person who acts only in a financial capacity with respect to the sale of a product, or who leases a product under a lease arrangement in which the selection, possession, maintenance, and operation of the product are controlled by a person other than the lessor."[12] Here, the undisputed facts were that RPS had acted only in a financial capacity and had no other role in AMBACO's acquisition or operation of the baler. Thus, RPS could not, as a matter of law, have been held responsible for Sheets's injuries.
 {¶ 27} Having addressed Sheets's arguments with respect to the products-liability claims, we now turn to his claims sounding in common-law negligence and breach of warranty. As Sheets's arguments reflect, the factual bases for the negligence and warranty claims were identical to those offered in support of the products-liability claims. Because we have held that Sheets failed to demonstrate a genuine issue of fact concerning the products-liability causes of action, we also hold that his negligence and warranty claims were properly rejected on summary judgment. Sheets's sole assignment of error is accordingly overruled, and the judgment of the trial court is affirmed.
Judgment affirmed.
Sundermann, P.J., and Painter, J., concur.
[1] See State ex rel. Howard v. Ferreri, 70 Ohio St.3d 587, 589,1994-Ohio-130, 639 N.E.2d 1189.
[2] See Dresher v. Burt, 75 Ohio St.3d 280, 293, 1996-Ohio-107,662 N.E.2d 264.
[3] State Farm Fire Cas. Co. v. Chrysler Corp. (1988),37 Ohio St.3d 1, 5-6, 523 N.E.2d 489.
[4] We recognize that the key required to perform the lock-out/tag-out procedure was broken. Nonetheless, as we note later in this opinion, the evidence was that OVC was responsible for maintaining the baler, and Sheets was unable to produce any evidence that the key's breaking was the result of a manufacturing defect.
[5] See Lewis v. Clark Equipment Co., 1st Dist. No. C-020271, 2003-Ohio-1543, at ¶ 8; Richards v. C. Schmidt Co. (1989),54 Ohio App.3d 123, 125, 561 N.E.2d 569.
[6] The manual produced by AMBACO covered a number of different models of balers. Although a recessed start button was listed as a feature of the balers, not all models included that feature. The baler at issue in this case did not have a recessed button.
[7] As we note later, there was no evidence that the machine's circuitry was flawed or in disrepair.
[8] See State Farm Cas. v. Black Decker, Inc., 8th Dist. No. 79573, 2002-Ohio-5821, at ¶ 12, jurisdictional motion overruled,98 Ohio St.3d 1480, 2003-Ohio-974, 784 N.E.2d 712 (where an expert's opinion was based upon a misapprehension of an uncontroverted fact, the opinion could not serve as the basis of liability).
[9] See Richards, supra.
[10] See Bleh v. Biro Mfg. Co. (2001), 142 Ohio App.3d 434, 438-439,756 N.E.2d 121, jurisdictional motion overruled (2001), 93 Ohio St.3d 1416,754 N.E.2d 262.
[11] Sheets himself notes that Evid.R. 407, regarding subsequent remedial measures, was inapplicable to the products-liability issue in question.
[12] See, also, Long v. Tokai Bank of California (1996),114 Ohio App.3d 116, 126-127, 682 N.E.2d 1052.