ANDERSON ET AL., CROSS-APPELLEES, *v.* OLMSTED UTILITY EQUIPMENT, INC., APPELLEE AND CROSS-APPELLANT; HARVEY HUBBELL CORPORATION, OHIO BRASS DIVISION, ET AL., APPELLANTS.

[Cite as Anderson *v.* Olmsted Utility Equip., Inc. (1991), 60 Ohio St. 3d 124.]

(No. 90-918—Submitted April 9, 1991—Decided June 5, 1991.)

126

*Martin F. White* and *David F. McLain,* for cross-appellees.

*Arter & Hadden, Irene C. Keyse-Walker, Margaret H. Joyce* and *Edward R. Brown,* for appellee and cross-appellant.

*Quandt, Giffels, Buck & Rodgers Co., L.P.A., Walter R. Matchinga* and *Hunter Havens,* for appellant Harvey Hubbell Corp., Ohio Brass Division.

*Rheuban & Palma, Norman A. Rheuban* and *Robert M. Palma,* for appellant Regal Tube Co.

DOUGLAS, J.

I

The first issue presented for our consideration is whether the court of appeals properly concluded that Anderson and Carlson were entitled to recovery against Olmsted based upon claims of strict liability and implied warranty.[3]

Olmsted argues that strict liability is not a viable cause of action in this case because it is neither a manufacturer nor a seller as required by Section 402A of 2 Restatement of the Law 2d, Torts (1965) 347-348. Rather, argues Olmsted, it merely contracted with the city to "rebuild" or "refurbish" or "repair" the aerial device and, therefore, Anderson's and Carlson's only recourse against it would lie in negligence, and not strict liability.

Olmsted's arguments are not persuasive. In the instant cause, the contract between the city and Olmsted required that Olmsted totally *remanufacture* the hydraulic aerial device including "100% tear down, inspection and *rebuild.*" (Emphasis added.) When a product is totally remanufactured or rebuilt, it becomes, for all intent and purposes, a new product. *Fugate* v. *AAA Machinery & Equipment Co.* (E.D. Tenn. 1984), 593 F. Supp. 392. Just because the prefix *re* is attached to the word manufacture does not alter the true meaning of the word. To find that a remanufacturer is anything but a manufacturer would be illogical.

Our analysis of this issue applies only to causes of action arising prior to the effective date of the Product Liability Act, R.C. 2307.71 through 2307.80. However, this recently enacted legislation, though technically not applicable here, lends insight and provides that one who rebuilds a product or a component part of a product is, indeed, a manufacturer.[4]

Thus, based on the foregoing, we believe strict liability applies with equal force to a commercial entity engaged in remanufacturing or rebuilding a defective product. Other jurisdictions which have addressed a similar issue have also reached an analogous conclusion. See *Rollins* v. *Cherokee Warehouses, Inc.* (E.D. Tenn. 1986), 635 F. Supp. 136; *Michalko* v. *Cooke Color & Chemical Corp.* (1982), 91 N.J. 386, 451 A. 2d 179.

Furthermore, we reject Olmsted's argument that strict liability is not applicable because it did not actually sell the aerial device to the city. It is Olmsted's contention that a "sale" did not occur because title to the aerial device remained at all times with the city. By accepting Olmsted's argument, we would be required to find that in every instance where a user or consumer of a defective product is injured an actual sale (exchange of title) of the product which causes the injury is a prerequisite to imposition of strict liability. Not only does Olmsted's proposition ignore the realities of modern-

---

[3] In *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317, 320, 4 O.O. 3d 466, 468, 364 N.E. 2d 267, 270, this court emphasized that strict liability in tort and implied warranty are "virtually indistinguishable." Therefore, for sake of convenience, we will address both claims under the theory of strict liability.

[4] R.C. 2307.71(I) provides:

" 'Manufacturer' means a person engaged in a business to design, formulate, produce, create, make, construct, assemble, or *rebuild a product or a component of a product.*" (Emphasis added.)

day business transactions, but also it is contrary to the underlying policy reasons for which strict liability was adopted.

In *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317, 322, 4 O.O. 3d 466, 469, 364 N.E. 2d 267, 271, we adopted Section 402A of the Restatement, in part, because "the Restatement formulation, together with its numerous illustrative comments, greatly facilitates analysis in this area * * *." Neither Section 402A nor its Comments define commercial transactions which may or may not constitute a "sale" for purposes of imposing strict liability. However, Comment *c* supports the extension of strict liability to situations other than sales, and provides in pertinent part:

"* * * [T]he justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products." *Id.* at 349-350.

In *Perfection Paint & Color Co.* v. *Konduris* (1970), 147 Ind. App. 106, 114, 258 N.E. 2d 681, 686, when presented with a similar argument to that posed by Olmsted, the Indiana appellate court aptly observed the rationale and justification behind Section 402A and stated:

"It is therefore apparent that the tenor of the Restatement is one of strict liability of a seller because of a special duty and responsibility placed upon a seller who has *injected goods into the stream of commerce.* The consuming public is to be protected and indemnified from any harm suffered as a result of a defect in a product being used as intended. The accomplishment of the Restatement's stated objectives and the protection which flows therefrom is not dependent upon a 'sale'. The rule is really one of liability to the seller for defective goods which the seller places in commerce. A technical and complete sales transaction, while being a common and easily recognizable commercial transaction, is not the only commercial transaction which comes within the purview of the rule of 'strict liability'. *To limit the rule to only those situations in which there has been an actual sale would be to circumscribe the rule to such an extent that its purpose might be defeated.*" (Emphasis added.)

In *Perfection Paint & Color Co.*, an action was brought against a supplier who had sold paint which did not adhere to the purchaser's floor. To remove the paint, the supplier, free of charge, furnished the purchaser with a lacquer reducer. The court determined that the supplier could be strictly liable for the death of an employee when the lacquer reducer was ignited by a hot water heater, even though the reducer was not technically "sold" to the producer.

*Perfection Paint & Color Co.* does not stand alone. Many courts have utilized much the same rationale and extended strict liability in non-sale situations. A common thread that runs through most of these cases is not

whether there was an "actual" sale in the technical sense of the word, but more importantly whether a product was placed into the stream of commerce. See, *e.g., Delaney* v. *Towmotor Corp.* (C.A. 2, 1964), 339 F. 2d 4, 6 (Strict liability applied to a manufacturer who lent a fork lift to an employer for demonstration purposes and the employee was injured when an overhead guard on the lift collapsed.); *Miles* v. *General Tire & Rubber Co.* (1983), 10 Ohio App. 3d 186, 189, 10 OBR 258, 260-261, 460 N.E. 2d 1377, 1380 ("There is no logical reason to distinguish commercial lessors from manufacturers or sellers for the application of strict liability for dangerously defective goods. Commercial lessors, like manufacturers and sellers, regularly introduce potentially dangerous products into the stream of commerce and similarly are in a better financial and technical position than lessees to ensure against the risk for injuries from defectively designed products. Commercial lessors are also better able to analyze the potential danger of a product than lessees since they deal regularly with the product."); and *First Natl. Bank of Mobile* v. *Cessna Aircraft Co.* (Ala. 1978), 365 So. 2d 966, 968 (Strict liability is applicable where a product is placed in the stream of commerce by demonstration, lease, free sample or sale).

In light of the foregoing, we believe that even though title to the remanufactured hydraulic aerial device may have remained at all times with the city, this fact, standing alone, does not defeat Anderson's and Carlson's strict liability claims. Olmsted, upon placing the defective product into the stream of commerce, is accountable to those who ultimately use the product. Accordingly, we hold that for purposes of claims of products liability based upon the theory of strict liability in tort, a sale can occur when a product is placed in the stream of commerce.

Moreover, notwithstanding our acceptance of the stream of commerce approach, we are inclined to find that Olmsted did "actually" sell the aerial device. The record indicates that Olmsted agreed to remanufacture the device and sell the city a new truck. Olmsted disassembled the aerial device, replaced some old parts with new parts, rebuilt the aerial device, and remounted it onto the new truck. Because the process of remanufacturing and rebuilding the aerial device was such an integral part of the sale of the truck, we are constrained to hold that the aerial device was, in fact, sold. Therefore, absent the stream of commerce approach, *supra,* a claim of strict liability would not be defeated in the instant cause simply because the aerial device, by itself, was not sold.

## II

The second issue presented to us is whether the court of appeals erred in finding that the trial court properly denied Olmsted's motions for a directed verdict concerning Anderson's and Carlson's express warranty claims.

Olmsted contends that Anderson and Carlson are not third-party beneficiaries of the contract between the city and Olmsted. Olmsted argues that Anderson and Carlson are "incidental" as opposed to "intended" beneficiaries of the contract and, therefore, Anderson and Carlson do not have enforceable rights under the contract. In support of its position, Olmsted cites *Hill* v. *Sonitrol of Southwestern Ohio, Inc.* (1988), 36 Ohio St. 3d 36, 521 N.E. 2d 780. Upon the facts of this case, we do not agree with Olmsted's contentions and, ac-

cordingly, affirm the court of appeals on this issue.

In *Hill,* we held that an employee of a bookstore, who shortly after closing one evening was forced back into the store by an assailant and raped, did not have a cause of action against the store because the clear terms of the contract between the security company and the bookstore indicated it was entered into for the protection of property, not people. This court, in adopting Section 302 of 2 Restatement of the Law 2d, Contracts (1981) 439-440, and the "intent to benefit" test as explained in *Norfolk & Western Co.* v. *United States* (C.A. 6, 1980), 641 F. 2d 1201, 1208,[5] reached the conclusion that the bookstore employee was barred from recovery against the security system company because the employee was merely an incidental beneficiary to the contract.

However, in this case, it is clear to us that the city, as promisee, intended that Anderson and Carlson benefit from the contract. The specific terms of the contract provided that "[t]he City of Niles is interested in having this equipment rebuilt to 100% Holan specifications and *safety.*" (Emphasis added.) In addition, when questioned at trial concerning the inspection and rebuilding of the aerial device, Charles Burgess, the superintendent of the city's light department, testified that the purpose of rebuilding the aerial device was for safety of linemen who were to use the truck.

Indeed, Anderson and Carlson were not merely incidental beneficiaries but were, in all respects, intended beneficiaries under the contract. Thus, Anderson and Carlson were entitled to proceed with their breach of express warranty claims against Olmsted.

### III

Having determined that Olmsted was properly held accountable to Anderson and Carlson on theories of strict liability and express warranty, we must next determine whether Olmsted is legally entitled to advance an action for indemnity against Ohio Brass and Regal.[6]

Ohio Brass and Regal contend that the court of appeals erred in reversing the trial court's dismissal of Olmsted's third-party complaint. Specifically, Ohio Brass and Regal argue that a remanufacturer who, pursuant to a contract, agrees to totally rebuild and inspect a product is solely liable for any injuries sustained by a third party due to the defective condition of the remanufactured or rebuilt product.

We are not persuaded by Ohio Brass's and Regal's argument. In reviewing the dismissal of Olmsted's complaint pursuant to Civ. R. 12(B)(6), we must, as a matter of law, accept all

---

[5] Section 302 of the Restatement and the "intent to benefit" test require, in general terms, that in order for a third-party beneficiary to have enforceable rights under a contract, circumstances surrounding the promise between the promisor and promisee must indicate that the promisee intended to benefit the third party, and the performance of that promise must also satisfy a duty owed by the promisee to the beneficiary. *Hill, supra,* at 40, 521 N.E. 2d at 784-785.

[6] In its brief to this court, Olmsted makes a passing reference that it seeks relief against Ohio Brass and Regal not only for indemnity but also for contribution. However, we note that Olmsted's third-party complaint is predicated solely on a claim for indemnification. Accordingly, we only address the propriety of Olmsted's indemnification claim. We do not mean to say, however, that upon remand, Olmsted would be precluded from filing an amended complaint to include a cause of action for contribution.

the allegations in the complaint as true. *Mitchell* v. *Lawson Milk Co.* (1988), 40 Ohio St. 3d 190, 192, 532 N.E. 2d 753, 756. Moreover, "[i]n order for a court to dismiss a complaint for failure to state a claim upon which relief can be granted * * *, it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery. * * *" *O'Brien* v. *University Community Tenants Union* (1975), 42 Ohio St. 2d 242, 71 O.O. 2d 223, 327 N.E. 2d 753, syllabus. Considered against the background of Anderson's and Carlson's claims, Olmsted's allegations as set forth in its amended third-party complaint are susceptible of a construction which may permit recovery against Ohio Brass and Regal.

In *Travelers Indemnity Co.* v. *Trowbridge* (1975), 41 Ohio St. 2d 11, 13-14, 70 O.O. 2d 6, 8, 321 N.E. 2d 787, 789, we stated that "[i]ndemnity * * * arises from contract, express or implied, and is a right of a person who has been compelled to pay what another should pay in full to require complete reimbursement * * *." Indemnity is essentially grounded in the equitable principle of restitution. See *Maryland Cas. Co.* v. *Frederick Co.* (1944), 142 Ohio St. 605, 607, 27 O.O. 529, 530-531, 53 N.E. 2d 795, 796.

Subsection (1) to Section 93 of the Restatement of the Law, Restitution (1937) 407-408, addresses indemnity in a chain of distribution case and provides:

"Where a person has supplied to another a chattel which because of the supplier's negligence or other fault is dangerously defective for the use for which it is supplied and both have become liable in tort to a third person injured by such use, the supplier is under a duty to indemnify the other for expenditures properly made in discharge of the claim of the third person, if the other used or disposed of the chattel in reliance upon the supplier's care and if, as between the two, such reliance was justifiable."[7]

Comment *a* to Subsection (1) provides that "[t]he supplier may have been a manufacturer or dealer" and that "[t]he claimant may be a manufacturer who incorporated the chattel in his own product * * *." *Id.* at 408. Hence, we hold that a manufacturer of a finished product who is required to pay for injuries sustained by a third party due to the defective condition of a component part integrated into the product may bring a cause of action against the manufacturer or. supplier of that component part for indemnification.

A product may be comprised of several parts and, thus, the product is the sum of its parts. If one of the components in the finished product is defective, then the finished product itself may become defective as a result. The policy behind products liability is to place liability on those who create the danger by placing the defective product into the stream of commerce. If a component part manufacturer or supplier creates the danger by placing the product into the stream of commerce, liability can, in certain situations, be shifted to the component part manufacturer and away from the manufacturer of the finished product.

In the case at bar, Olmsted, upon

---

[7] We agree with the conclusion reached by Professor Madden that a seller's or supplier's liability is not solely limited to actions based on negligence. Because liability is based on the supplier's negligence "or other fault," the party seeking indemnification can, in addition to negligence, recover on claims of strict liability and/or breach of warranty. See 2 Madden, Products Liability (1988) 153, Section 17.1.

remanufacturing and rebuilding the hydraulic aerial device, became a manufacturer. Olmsted was required to replace some older parts with new parts. However, many of the original parts were left intact. If Olmsted, on remand, can establish that liability arose from the use of a defective part which was manufactured or supplied by another, the manufacturer or supplier of the part used in the finished product may be required to indemnify Olmsted. Therefore, we agree with the court of appeals that the trial court erred in dismissing Olmsted's third-party complaint for indemnification against Ohio Brass and Regal.

Ohio Brass and Regal further contend that if we determine that Olmsted has a cognizable third-party claim, then the entire case should be remanded on the issue of liability and damages since they were not given the opportunity to defend or participate in the defense of Anderson's and Carlson's products liability actions against Olmsted. We disagree.

Ohio Brass and Regal were given the opportunity to participate in the defense of the products liability action. Ohio Brass and Regal were given notice and an opportunity to be heard. However, both voluntarily moved to dismiss themselves from the case. The dismissal of Ohio Brass and Regal had no effect on Anderson's and Carlson's action against Olmsted. Accordingly, we agree with the court of appeals that this case should be remanded for the limited purpose of addressing the potential liability of Ohio Brass and Regal.

The judgment of the court of appeals is affirmed, and the cause is remanded to the trial court for proceedings not inconsistent with this opinion.

*Judgment affirmed*
*and cause remanded.*

MOYER, C.J., SWEENEY, HOLMES, WRIGHT, H. BROWN and RESNICK, JJ., concur.