**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Stiner v. Amazon.com, Inc.*, **Slip Opinion No. 2020-Ohio-4632.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-4632

STINER, ADMR., APPELLANT, *v*. AMAZON.COM, INC., APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Stiner v. Amazon.com, Inc.*, Slip Opinion No. 2020-Ohio-4632.]**

*Torts—Products liability—Ohio Products Liability Act, R.C. 2307.71 et seq.—A supplier is a person that, among other things, "otherwise participates in the placing of a product in the stream of commerce"—R.C. 2307.71(A)(15)(a)(i)—A company is not a supplier when its conduct is not of a similar character as the sale, distribution, lease, preparation, blending, packaging, or labeling of a product—A company must exert some control over the product as a prerequisite to supplier liability.*

(No. 2019-0488—Submitted April 29, 2020—Decided October 1, 2020.)

APPEAL from the Court of Appeals for Lorain County, No. 17CA011215, 2019-Ohio-586.

_____

**FRENCH, J.**

{¶ 1} This products-liability lawsuit requires us to decide whether appellee, Amazon.com, Inc., has participated in placing a product in the stream of commerce and therefore can be held liable as a "supplier" under the Ohio Products Liability Act, R.C. 2307.71 et seq. Under the facts of this case, we conclude that Amazon is not a supplier, as defined in R.C. 2307.71(A)(15)(a)(ii). Accordingly, we affirm the judgment of the Ninth District Court of Appeals and conclude that the trial court properly granted summary judgment to Amazon on the product-liability claim of appellant, Dennis Stiner, the administrator of the estate of Logan Stiner.

## FACTS AND PROCEDURAL BACKGROUND

{¶ 2} This lawsuit arises from the tragic death of 18-year-old Logan Stiner, appellant's son. Logan died in May 2014 after ingesting a fatal dose of caffeine powder that he obtained from his friend, K.K. Several months earlier, K.K. went to Amazon's website and performed a product search using the term "pre-workout." Her search generated several products. When she clicked on one of the listed products, Hard Rhino Pure Caffeine Powder appeared as an option. Tenkoris, L.L.C., a third-party vendor, sold the caffeine powder and posted the product on Amazon's website under the storefront name TheBulkSource.

{¶ 3} Tenkoris listed the powder on the Amazon.com Marketplace. To become a seller on the marketplace, third-party vendors must agree to the Amazon Services Business Solutions Agreement. The agreement requires third-party vendors to "source, sell, fulfill, ship and deliver" the products they sell on the marketplace. The seller is responsible for ensuring proper packaging of its product, including compliance with all applicable laws and minimum-age, marking, and labeling requirements. The product description displayed to the buyer on the Amazon marketplace comes from the seller, who must provide "accurate and complete Required Product Information for each product or service that [it] make[s] available to be listed through the Amazon Site and promptly update such

information as necessary to ensure it at all times remains accurate and complete." The seller sets the price, subject to certain restrictions, including that the seller must maintain price parity between products it sells on the Amazon marketplace and on other sales channels. The seller is "responsible for any non-conformity or defect in, or any public or private recall of, any of [its] Products." While the seller may offer a warranty of its choosing, Amazon does not warrant third-party products sold on the marketplace.

{¶ 4} Third-party sellers can choose to use the "Fulfillment by Amazon" program. For a fee, Amazon stores the seller's product in an Amazon fulfillment center until it is purchased, at which point Amazon packages and ships the product to buyers. Tenkoris, however, did not use the Fulfillment by Amazon program to sell the Hard Rhino caffeine powder to K.K. Tenkoris kept the powder in its own inventory, fulfilled the order, packaged it, and shipped it directly to K.K.

{¶ 5} K.K. purchased the caffeine powder on February 27, 2014. Her purchase order states that the powder is "Sold by: TheBulkSource," provides a link to TheBulkSource's return and replacement policy, and indicates that the buyer should contact TheBulkSource for any questions about the order. According to Tenkoris, Amazon never had possession of the caffeine powder and never physically touched the product.

{¶ 6} Three months after purchasing the caffeine powder, K.K. poured some into a plastic bag and gave it to her friend Logan. That same day, Logan was found unresponsive in his home and was pronounced dead on the scene. The coroner concluded that Logan had died of cardiac arrhythmia and seizure from acute caffeine toxicity.

{¶ 7} At the time of K.K.'s purchase, the Federal Drug Administration ("FDA") had not restricted pure caffeine powder and had not taken a public position that it was dangerous. In July 2014, Amazon removed caffeine-powder listings

from its website in response to the FDA's publication of an advisory warning consumers of the dangers of pure powdered caffeine.

{¶ 8} After Logan's death, Stiner commenced this action against Amazon and its affiliated companies, Tenkoris, K.K., CSPC Pharmaceutical Co. Ltd. (the manufacturer of the caffeine powder), and Green Wave Ingredients, Inc. (the importer). The complaint asserted 12 causes of action, alleging strict product liability and negligence under the Ohio Products Liability Act, violations of the Ohio Food and Drug Safety Act, supplier negligence, breach of the implied warranty of merchantability, punitive damages, and fraud. Stiner eventually dismissed Tenkoris, Green Wave, and K.K. from the action. Stiner was unable to complete service of process on CSPC Pharmaceutical, a Chinese company.

{¶ 9} Amazon remained in the lawsuit as the sole defendant. Amazon and Stiner both filed motions for summary judgment. The trial court granted summary judgment to Amazon on all counts and denied Stiner's motion.

{¶ 10} The Ninth District affirmed. On appeal, Stiner abandoned all but his claims under the Ohio Products Liability Act and the Ohio Pure Food and Drug Act. The court of appeals noted that Stiner's product-liability claims turned on whether Amazon is a "supplier," defined in R.C. 2307.71(A)(15) as a person who "sells, distributes, leases, prepares, blends, packages, labels, or otherwise participates in the placing of a product in the stream of commerce." The court concluded that Stiner could not point to any evidence in the record to establish that Amazon is a supplier within the meaning of the statute. The court also affirmed summary judgment for Amazon on Stiner's claims under the Pure Food and Drug Safety Act.

## QUESTIONS PRESENTED

{¶ 11} This court initially declined to review Stiner's discretionary appeal. 156 Ohio St.3d 1443, 2019-Ohio-2496, 125 N.E.3d 911. But on reconsideration,

4

we accepted the appeal, 156 Ohio St.3d 1487, 2019-Ohio-3331, 129 N.E.3d 461, which presents two propositions of law limited to Stiner's product-liability claims:

(1) Where an internet provider such as Amazon acts as more than a neutral platform for third-party sales and actively promotes the sale of a deadly product, courts must apply public policy considerations underlying Ohio's consumer protection laws, including incentivizing safety and shifting risk away from consumers, in determining supplier status.

(2) An internet provider such as Amazon "otherwise participates in placing a product in the stream of commerce" and is a "supplier" under O.R.C. [2307.71(A)(15)] when it agrees to promote a deadly consumable product, introduces and recommends that product to a consumer, and otherwise uses its influence to lead that consumer to believe the product is safe.

## ANALYSIS

### Meaning of "supplier" under the Ohio Products Liability Act

{¶ 12} Stiner asserted four claims under the Ohio Products Liability Act, R.C. 2307.71 et seq. Three of his claims sought to hold Amazon liable for defects in design (R.C. 2307.75), inadequate warnings or instructions (R.C. 2307.76), and failure to conform to representations, (R.C. 2307.77). While these provisions impose liability on manufacturers, Stiner does not contend that Amazon is a manufacturer. Rather, he seeks to impose liability on Amazon by way of R.C. 2307.78(B), which subjects a supplier to product liability "as if it were the manufacturer" under certain circumstances, including if the manufacturer is not subject to judicial process in Ohio or if the claimant cannot enforce a judgment against the manufacturer due to actual or asserted insolvency. R.C. 2307.78(B)(1)

and (2). Stiner's fourth claim seeks to hold Amazon liable for supplier negligence under R.C. 2307.78(A). Stiner's product-liability and negligence claims therefore all depend on whether Amazon is a "supplier" under the Act.

{¶ 13} For the purposes of the Act, the definition of a "supplier" includes "[a] person that, in the course of a business conducted for the purpose, sells, distributes, leases, prepares, blends, packages, labels, or otherwise participates in the placing of a product in the stream of commerce." R.C. 2307.71(A)(15)(a)(i). Stiner argues that Amazon is a supplier because it participated in the placing of the caffeine powder in the stream of commerce.

{¶ 14} In construing the definition of "supplier" in R.C. 2307.71, our paramount concern is the General Assembly's intent in enacting the statute. *State ex rel. United States Steel Corp. v. Zaleski,* 98 Ohio St.3d 395, 2003-Ohio-1630, 786 N.E.2d 39, ¶ 12. To discern that intent, we review the statutory language, reading words and phrases in context and construing them according to the rules of grammar and common usage. *State ex rel. Steele v. Morrissey*, 103 Ohio St.3d 355, 2004-Ohio-4960, 815 N.E.2d 1107, ¶ 21. When interpreting a statute, we must consider the text in its entirety and not just isolated words or phrases. *Vossman v. AirNet Sys., Inc.*, __Ohio St.3d __, 2020-Ohio-872, __ N.E.3d__, ¶ 14.

{¶ 15} We start with the language immediately preceding the operative catchall provision. A supplier is one who "sells, distributes, leases, prepares, blends, packages, labels, or *otherwise* participates in the placing of a product in the stream of commerce." (Emphasis added). R.C. 2307.71(A)(15)(a)(i). The phrase "otherwise participates" signifies that the catchall phrase must be read in conjunction with the preceding list of specific actions that may subject a supplier to liability. When, as here, a statute contains a list of specific terms followed by a catchall term linked to the previous list, "we consider the catchall term as embracing only things of a similar character as those comprehended by the preceding terms." *Fraley v. Estate of Oeding*, 138 Ohio St.3d 250, 2014-Ohio-452,

6 N.E.3d 9, ¶ 23. "When the initial terms all belong to an obvious and readily identifiable genus, one presumes that the speaker or writer has that category in mind for the entire passage." Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012).

{¶ 16} Applying that rule here, the catchall provision—"otherwise participates in the placing of a product in the stream of commerce"—embraces conduct of a similar character as the sale, distribution, lease, preparation, blending, packaging or labeling of a product. All the specified actions involve some act of control over a product or preparation of a product for use or consumption.

{¶ 17} The next subsection of the statute further demonstrates that the General Assembly did not intend to impose supplier liability on persons who do not exercise a requisite level of control over a product. The Act states that the definition of "supplier" does not include "[a]ny person who acts only in a financial capacity with respect to the sale of a product" or a party "who leases a product under a lease arrangement in which the selection, possession, maintenance, and operation of the product are controlled by a person other than the lessor." R.C. 2307.71(A)(15)(b)(iv). This provision recognizes that certain persons may participate in the chain of a product's distribution by providing the financial means for its sale or arranging a lease of the product. But those persons do not become "suppliers" in the absence of control over the product, exhibited by actions such as the selection, possession, maintenance, and operation of the product.

{¶ 18} The language in R.C. 2307.71(A)(15)(b)(iv) codifies a common-law distinction between a commercial lessor, who can be held strictly liable for supplying or selecting the equipment at issue, and a financial lessor, who participates only in the financing of a transaction. *See Long v. Tokai Bank of California*, 114 Ohio App.3d 116, 123-125, 682 N.E.2d 1052 (2d Dist.1996) (citing *Miles v. General Tire & Rubber Co.*, 10 Ohio App.3d 186, 460 N.E.2d 1377 (10th Dist.1983), and other common-law cases predating the Act). While a financial

lessor may have participated in the delivery of a product into the stream of commerce, courts have recognized that "this tangential participation does not justify the imposition of strict liability." *Id*. at 125. The Act therefore codifies a well-settled principle in products-liability law that strict liability does not extend to every participant in a product's chain of distribution.

{¶ 19} When reading the definition of "supplier" in R.C. 2307.71(A)(15)(a)(i) together with the list of entities that are not suppliers found in R.C. 2307.71(A)(15)(b), we conclude that a person who "otherwise participates in the placing of a product in the stream of commerce" must exert some control over the product as a prerequisite to supplier liability.

### Amazon is not a supplier

{¶ 20} Based on the understanding that placing a product in the stream of commerce requires some act of control over the product, we conclude that Amazon should not be held liable as a supplier under the Ohio Products Liability Act. Tenkoris, the seller of the caffeine powder, had sole responsibility for the fulfillment, packaging, labeling, and shipping of the product directly to customers. Amazon has no relationship with the manufacturer or entities in the seller's distribution channel. Tenkoris, not Amazon, decided what to sell on Amazon, and by agreement, took on the responsibility of sourcing the product from the manufacturer until it reached the end user. Tenkoris wrote the product description for the caffeine powder that buyers would see on the Amazon marketplace. K.K.'s purchase order clearly states that the powder is "Sold by: TheBulkSource" and indicates that the buyer should contact TheBulkSource for any questions about the order. And Tenkoris acknowledges that Amazon never had possession of the caffeine powder and never physically touched the product.

{¶ 21} Stiner points to various factors to argue that Amazon controls all aspects of sales by third-party vendors. According to Stiner, Amazon prevents sellers from contacting customers; retains sole discretion to determine the content,

appearance, and design of its website; reserves the right to alter the content of product descriptions; and imposes restrictions on pricing. While these factors may demonstrate the degree of control that Amazon seeks to exert in its relationship with sellers, they do not establish that Amazon exercised control over the product itself sufficient to make it a "supplier" under the Act.

{¶ 22} Other courts, focusing similarly on the degree of control that Amazon had exerted over a product, have declined to hold Amazon liable for products sold on its marketplace by third-party vendors. In *Allstate N.J. Ins. Co. v. Amazon.com, Inc.,* D.N.J. No. 17-2738, 2018 U.S. Dist. LEXIS 123081 (July 24, 2018), the court construed a provision in New Jersey's products-liability act that is similar to Ohio's act. The New Jersey law defined a seller as "any party involved in placing a product in the line of commerce." *Id*. at *19. The court concluded that "control over the product is the touchstone" under that state's law for determining whether a party has the requisite involvement to be a product seller. *Id*. at *20. And it found that Amazon never exercised control over the product sufficient to make it the seller when the third-party seller had decided what to sell, sourced the product from the manufacturer, and ensured the product was properly packaged and complied with all applicable laws. *Id*. at *22-23.

{¶ 23} The United States Sixth Circuit Court of Appeals also considered Amazon's liability under Tennessee's products-liability law, which also hinged on a seller's degree of control over a product. *Fox v. Amazon.com, Inc*., 930 F.3d 415, 424-425 (6th Cir.2019). The court found that Amazon could not be held liable for a defective hoverboard sold on its website because it had not chosen to offer the hoverboard for sale, had not set the price, and had not made any representations about the safety or specifications of the hoverboard on the Amazon marketplace. *Id*. at 425. *See also Carpenter v. Amazon.com, Inc*., N.D. Cal. No. 17-cv-03221, 2019 U.S. Dist. LEXIS 45317, *13-14 (Mar. 19, 2019) (granting summary judgment to Amazon because plaintiffs did not establish that Amazon's role was

integral to the business enterprise and a necessary factor in bringing hoverboards to the consumer market).

{¶ 24} While not controlling on this court, these decisions demonstrate a prevailing understanding that Amazon's role in the chain of distribution is not sufficient to trigger the imposition of strict liability for defective products sold by third-party vendors on its marketplace.

### The policy objectives of products-liability law

{¶ 25} Stiner argues that our determination whether Amazon is a "supplier" under the Act should take into account the policy objectives of products-liability law, as articulated in 2 Restatement of the Law 2d, Torts, Section 402A (1965), which this court had approved as the state of the law governing products-liability claims in Ohio before the January 5, 1988 effective date of the Act. *See* Am.Sub.H.B. No. 1, 142 Ohio Laws, Part I, 1661, 1757; *see also Temple v. Wean United, Inc*., 50 Ohio St.2d 317, 322, 364 N.E.2d 267 (1977).

{¶ 26} Stiner relies specifically on *Anderson v. Olmsted Util. Equip., Inc.,* 60 Ohio St.3d 124, 573 N.E.2d 626 (1991), to argue that the policy considerations evident in the Restatement warrant the imposition of liability on Amazon for placing a product into the stream of commerce. In *Anderson*, this court held that the rebuilder of a defective device could be held strictly liable under Section 402A, even if it did not actually sell the device. *Id*. at 129. In reaching that conclusion, the court noted the rationale in Section 402A for imposing strict liability: " 'public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained.' " *Id.* at 128, quoting 2 Restatement, Section 402A, Comment c.

{¶ 27} This court has recognized that the principles of strict liability in Section 402A developed in order to achieve the policy objectives of promoting product safety and shifting the costs of injuries away from consumers. *Queen City*

*Terminals, Inc., v. Gen. Am. Transp. Corp.*, 73 Ohio St.3d 609, 621, 653 N.E.2d 661 (1995). We also presume that the General Assembly knows the common law when it enacts legislation. *Walden v. State*, 47 Ohio St.3d 47, 56, 547 N.E.2d 962 (1989) (Resnick, J., concurring in part and dissenting in part), citing *Davis v. Justice*, 31 Ohio St. 359, 364 (1877). Yet, when the General Assembly enacted the Products Liability Act in 1988, it did not include any language, either codified or uncodified, adopting the policy considerations articulated in Restatement Section 402A or in our common-law precedent. To the contrary, the General Assembly amended R.C. 2307.71(B), effective April 7, 2005, to add subsection (B), which expressly states that R.C. 2307.71 through 2307.80 "are intended to abrogate all common law product liability claims or causes of action." Am.Sub.S.B. No. 80, 150 Ohio Law 7955, Part V, 7915, 7955. Given this clear statement of legislative intent that the statutory text now controls Ohio's products-liability law, we must discern the General Assembly's intent from the text of the Act itself. For the reasons we stated earlier, we conclude that the inclusion of the phrase "otherwise participates in the placing of a product in the stream of commerce" in R.C. 2307.71(A)(15)(a)(i) means that a person must exert some control over the product as a prerequisite to supplier liability. Stiner has not shown that Amazon exercised the requisite amount of control over the caffeine powder sold on its marketplace.

{¶ 28} But even if we were to consider the policy objectives of products-liability law predating the Act, Stiner has not demonstrated that holding Amazon liable would promote product safety. Because Amazon does not have a relationship with the manufacturers of third-party products, Amazon lacks control over product safety. Amazon did not choose to offer the caffeine powder for sale and has no role in manufacturing, labeling or packaging the product. While Amazon can address safety issues by suspending or removing sellers, Amazon's control over its website does not establish that Amazon is in a position to eliminate the unsafe character of products in the first instance. Under the facts of this case, Stiner has not

demonstrated that Amazon was in a position to safeguard the quality and safety of the caffeine powder before it entered the stream of commerce.

{¶ 29} Finally, Stiner points to Amazon's retail dominance to argue that Amazon is the party best positioned to compensate injured consumers and to allocate those costs to itself and third-party vendors. Stiner's arguments for cost-spreading and risk allocation, however, implicate policy concerns that we reserve for the General Assembly to address.

## CONCLUSION

{¶ 30} Under the facts of this case, we find that Amazon is not a supplier, as defined in R.C. 2307.71(A)(15)(a), for the purposes of the Ohio Products Liability Act. Accordingly, we affirm the judgment of the Ninth District Court of Appeals and conclude that the trial court properly granted summary judgment to Amazon on the product-liability claims of Stiner.

Judgment affirmed.

O'CONNOR, C.J., and KENNEDY, FISCHER, DEWINE, and STEWART, JJ., concur.

DONNELLY, J., concurs in judgment only, with an opinion.

_____

**DONNELLY, J., concurring in judgment only.**

{¶ 31} Reluctantly, I agree that the definition of "supplier" in the Ohio Products Liability Act, R.C. 2307.71 et seq., is worded in such a way that it does not allow us to incorporate in it the role that appellee, Amazon.com, plays when a sale on its website is fulfilled by a third-party merchant. I disagree, though, with the notion that it would not promote the purpose of products-liability law to hold Amazon liable for unsafe products that would not reach consumers but for the consumers' decision to shop on Amazon's website. To the contrary, the failure to hold Amazon liable for injuries to its customers thwarts the purpose of products-liability law because it puts Amazon's customers at risk of being injured by a seller

12

that can easily make itself unreachable for redress. The use of strict liability would incentivize Amazon to select and monitor reputable merchants with safer products just as strict liability incentivizes sellers to select safer products that are sourced from reputable wholesalers or manufacturers.

{¶ 32} The Ohio Products Liability Act states that a "supplier" is a person that "sells, distributes, leases, prepares, blends, packages, labels, or otherwise participates in the placing of a product in the stream of commerce." R.C. 2307.71(A)(15)(a)(i). Although the catchall phrase "otherwise participates" is extremely broad, the canon of ejusdem generis requires us to limit a broad phrase that follows specific examples to items similar to those specific examples. *See Yates v. United States*, 574 U.S. 528, 545, 135 S.Ct. 1074, 191 L.Ed.2d 64 (2015). Accordingly, the Act considers a person participating in placing a product in the stream of commerce to be akin to a person selling, distributing, leasing, preparing, blending, packaging, or labeling a product.

{¶ 33} When the Ohio Products Liability Act became effective in 1988, Am.Sub.H.B. No. 1, 142 Ohio Laws, Part 1, 1661, we were still in the pre-Internet age, when brick-and-mortar retail was the norm and even mail-order retailers facilitated their own sales and fulfilled their own orders. *See* Thompson, *The History of Sears Predicts Nearly Everything Amazon Is Doing*, The Atlantic (Sept. 25, 2017), available at https://www.theatlantic.com/business/archive/2017/09 /sears-predicts-amazon/540888/ (accessed Sept. 8, 2020) [https://perma.cc/F47L-TY6J]. We did not yet have a product-distribution model involving a virtual company providing the face of a retail sale, publishing information about products for sale, engaging in all customer interactions regarding a sale, taking the customer's payment during a sale, ensuring that the product is received by the customer in exchange for that payment, and handling returns and other customer-service issues arising from that sale, all without ever owning, possessing, or even seeing the product that was sold. Thus, when the Act became effective, the General

Assembly undoubtedly had seller-facilitated and seller-fulfilled sales in mind. We should remember that the descriptors used in R.C. 2307.71(A)(15)(a)(i) to explain the meaning of "supplier" reflect the paradigm of retail sales in the 1980s; they need not be viewed as bedrock concepts that dictate our understanding of the purpose behind the Act.

{¶ 34} Applying the 1980s retail-sales paradigm to modern e-commerce produces results that strike me as inequitable. The Act applies to a person with a role as minor as placing a sticker on a product but not to a person that controls every single aspect of placing a product in the stream of commerce except for transferring ownership or physically controlling the product. The Act applies to a mom-and-pop retail store with a small, exclusively local customer base, but not to a business that is responsible for hundreds of millions of dollars' worth of retail sales in Ohio.[1] Indeed, the Act does not address many of the contemporary standards in technology, communications, and commerce—standards that have changed radically since 1988. The divide between the pre-Internet age and the current age is so profound that laws like this Act might as well have been written in the stone age. Notwithstanding all the foregoing, though, this court cannot modernize the Act by judicial fiat; we must apply the statutory scheme as it is currently written. *See State ex rel. Carna v. Teays Valley Local School Dist. Bd. of Edn.*, 131 Ohio

---

1. One source estimated that Amazon collected approximately $310 million in sales taxes to be paid to Ohio in 2018. Exner, *Amazon's huge impact on Ohio's sales tax base: Numbers Behind the News* (June 4, 2019), available at https://www.cleveland.com/datacentral/2019/06/amazons-huge-impact-on-ohios-sales-tax-base-numbers-behind-the-news.html (accessed Sept. 8, 2020) [https://perma.cc/3CME-5XTW].

St.3d 478, 2012-Ohio-1484, 967 N.E.2d 193, ¶ 18-20. So, in the stone age we must remain.[2]

{¶ 35} If the purposes and policy objectives at the foundation of products-liability law were taken into consideration, however, I believe that those objectives would be well-served by holding Amazon liable for unsafe, defective products that it allows its customers to purchase on its website. The fundamental purpose of the products-liability law is to protect consumers from harm, particularly to protect them from suffering harm without recourse. *See* Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)*, 69 Yale L.J. 1099, 1122-1123 (1960). The mechanism historically used to accomplish the purpose of consumer protection is to incentivize manufacturers to make safe products, to incentivize wholesalers to choose safe, reputable manufacturers, and to incentivize sellers to choose safe, reputable wholesalers. *See generally Brooks v. Beech Aircraft Corp.*, 120 N.M. 372, 376, 902 P.2d 54 (1995), citing *Vandermark v. Ford Motor Co.*, 61 Cal.2d 256, 262-263, 37 Cal.Rptr. 896, 391 P.2d 168 (1964). The mechanism used to ensure that consumers have recourse for any harm caused is to apply strict liability along the entire supply chain. By doing so, we ensure that at least one entity along that line—most likely the one with direct contact with the consumer—will be reachable by the consumer. Cavico Jr., *The Strict Tort Liability of Retailers, Wholesalers, and Distributors of Defective Products*, 12 Nova L.Rev. 213, 221-222 (1987); *State Farm Fire & Cas. Co. v. Amazon.com, Inc.*, 390 F.Supp.3d 964, 970 (W.D.Wis.2019) ("sellers and distributors are liable, not because of any particular activity on their part, but because they are proxies for the absent manufacturer").

---

2. I take heart in the fact that the majority has emphasized that Amazon is not subject to the Ohio Products Liability Act *under the facts of this case*. The decision today does not foreclose the possibility that Amazon constitutes a "supplier" under R.C. 2307.71(A)(15)(a)(i) in all contexts other than sales that are fulfilled by third parties.

{¶ 36} Even if Amazon cannot be considered a supplier in the traditional, pre-Internet sense, I believe that its all-encompassing participation in the sales transactions of its third-party merchants places Amazon squarely on the supply chain, between the seller and the consumer. Amazon plays the role of the seller by taking all customer orders, handling all payment processing, guaranteeing shipment terms, and processing returns. *State Farm*, 390 F.Supp.3d at 972. It even exceeds the role of the seller because it directly controls third-party merchants' pricing through explicit restrictions. Doyer, *Who Sells? Testing Amazon.com for Product Defect Liability in Pennsylvania and Beyond*, 28 J.L. & Pol'y 719, 748 (2020), discussing *Oberdorf v. Amazon.com Inc.*, 930 F.3d 136, 149 (3d Cir.2019), *vacated and reh'g en banc granted,* 936 F.3d 182 (3d Cir.2019).

{¶ 37} Perhaps even more importantly, Amazon exceeds the role of the seller because it indirectly controls the pricing of all products through its "proprietary 'Buy Box' system," its "inherent position of competition" with its third-party merchants, and its ability to collect and exploit all merchants' business data to drive down prices. *Id*. at 754, 756. Amazon controls all communication with the customer—"[t]hird-party sellers * * * are prohibited from communicating with Amazon customers except through the Amazon website, where such interactions are anonymized," *Bolger v. Amazon.com, L.L.C.*, ___ Cal.Rptr.3d ___, 53 Cal.App.5th 431, *11 (2020)—and Amazon is the party that customers will most likely be able to reach for any matter, including a products-liability lawsuit. Because Amazon is so deeply involved in the chain of distribution leading to the Amazon customer, Amazon is well positioned to monitor third-party sellers and their products and to limit its e-commerce services to reputable third-party sellers that select safer products, just as sellers are in a position to select safer products that are sourced from reputable wholesalers or manufacturers.

{¶ 38} The majority maintains that even if the court were to consider policy objectives, holding Amazon liable in this case would not promote the policy

16

objectives of products-liability law, because Amazon does not have a relationship with the manufacturers of the third parties' products, does not choose the products to be sold, and does not make any choices about their preparation or marketing. But the majority's position merely identifies what Amazon is *not* obligated to do under the Ohio Products Liability Act, not what Amazon *should* be obligated to do to satisfy policy objectives. The fact that the limited wording of the Act leaves a gap that allows e-commerce entities like Amazon to evade any obligation does not mean that there is a corresponding gap in the policy underlying the law; it means that the Act is failing to fully realize its purpose.

{¶ 39} The central mechanism of products-liability law is to force members of the supply chain to make safer decisions about products that reach consumers. Amazon is the final stop in the supply chain, and it is capable of making decisions about third-party sales that would better protect Amazon's customers from defective, hazardous products. Accordingly, from a policy standpoint, the objectives underlying products-liability law would be accomplished by treating Amazon—in the context of its sales fulfilled by third parties—the same way it treats sellers.

{¶ 40} Closing the obligation gap in the Ohio Products Liability Act for actors like Amazon would ensure the utmost protection that Ohio consumers deserve. But as the majority says, such policy concerns are for the General Assembly, not this court, to address. Accordingly, I concur in judgment only.

––––––––––––––

Brian K. Balser Co., L.P.A., and Brian K. Balser; and Merriman, Legando, Williams & Klang, L.L.C., Drew Legando, and Edward S. Jerse, for appellant.

Porter, Wright, Morris & Arthur, L.L.P., Joyce D. Edelman, Kathleen M. Trafford, and L. Bradfield Hughes; and Perkins Coie, L.L.P., and Julie L. Hussey, for appellees.

Christopher J. Walker, urging affirmance for amici curiae Chamber of Commerce of the United States of America and Ohio Chamber of Commerce.

_____